UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ABBY GROSSBERG,                                      Case No.: 1:23-cv-02368-JMF

      *Plaintiff,*

  -- against --                                    **AMENDED COMPLAINT**

FOX CORPORATION, FOX NEWS NETWORK, LLC,              **JURY TRIAL DEMANDED**
JERRY ANDREWS, TUCKER CARLSON,
DAVID CLARK, THOMAS FOX,
RALPH GIORDANO, ALEXANDER MCCASKILL,
JUSTIN WELLS, and LESLEY WEST,

      *Defendants.*
-----------------------------------------------------------------X

      Plaintiff, Abby Grossberg, by and through her attorneys, Filippatos PLLC, hereby files this Complaint against Defendants Fox Corporation, Fox News Network, LLC (collectively "Fox News" or "Entity Defendants"), as well as Defendants Jerry Andrews, Tucker Carlson, David Clark, Thomas Fox, Ralph Giordano, Alexander McCaskill, Justin Wells, and Lesley West (collectively "Individual Defendants"), to allege upon knowledge concerning her own experience, and upon information and belief as to all other matters, as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     This case is as troubling as it is familiar; it is yet another in the long line of cases chronicling the misogynistic environment that permeates Fox News and fosters a toxic workplace where truth remains a fugitive while female workers are verbally violated on almost a daily basis by a poisonous and entrenched patriarchy.

      2.     Plaintiff Abby Grossberg, a dedicated and hardworking former Senior Booking Producer on the *Sunday Morning Futures with Maria Bartiromo* ("SMFMB") show and currently the Head of Booking on the *Tucker Carlson Tonight* ("TCT") program, endured an extremely

hostile work environment under the auspices of senior executives, including the Individual Defendants.  Ms. Grossberg was isolated, overworked, undervalued, denied opportunities for promotion, and generally treated significantly worse than her male counterparts, even when those men were less qualified than her.

3.    Ultimately, in August 2022, Ms. Grossberg could no longer tolerate the toxic atmosphere victimizing women on SMFMB and sought a fresh start by accepting a position with Tucker Carlson, the veritable face of Fox News.  To her dismay, Ms. Grossberg went from the proverbial frying pan into the fire.  As Head of Booking on TCT, Ms. Grossberg continued to endure a work environment that subjugated women based on vile sexist stereotypes, typecasted religious minorities and belittled their traditions, and demonstrated little to no regard for those suffering from mental illness.  TCT, and its eponymous host, are no strangers to controversy – deemed by some as "the most racist show in the history of cable news."[1] Mr. Carlson's derogatory comments towards women, and his disdain for those who dare to object to such misogyny, is well known on the set of TCT.

4.    Consistent with Fox News's long history of tolerating gender harassment and targeting women who report it, Fox News retaliated against Ms. Grossberg after she complained about the unlawful harassment (based on her gender and Jewish religion) to which she was subjected by Alexander McCaskill and Justin Wells, both Producers on TCT.  ***Mere hours after*** Ms. Grossberg had the courage to speak up to a superior named Thomas Fox, Senior Editorial

---

[1] *See* Nicholas Confessore, N.Y. TIMES, *What to Know About Tucker Carlson's Rise,* Apr. 30, 2022, *available at* https://www.nytimes.com/2022/04/30/business/media/tucker-carlson-fox-news-takeaways.html (last accessed Feb. 22, 2023); *see also* Nicolas Confessore, N.Y. TIMES, *How Tucker Carlson Reshaped Fox News — and Became Trump's Heir,* April 30, 2022, updated May 16, 2022, *available at* https://www.nytimes.com/2022/04/30/us/tucker-carlson-fox-news.html?action=click&module=RelatedLinks&pgtype=Article (last accessed Mar. 20, 2023).

Producer, she was called into a meeting with Human Resources and presented with a bogus written warning by Monica Mekeel, Senior Vice President of Human Resources ("HR").  Then, even after expressing her concerns to Ms. Mekeel directly, Ms. Grossberg was disregarded and ordered to return to work and face the same environment about which she had just complained, which she had made clear was causing her severe stress and anxiety.  Ultimately, feeling ignored and unprotected by Fox News, and suffering from severe anxiety due to the unlawful treatment she received from her male supervisors and colleagues, Ms. Grossberg sought protected FMLA leave supported by her therapist.

5.      Moreover, as detailed below, Ms. Grossberg received damaging and woefully inferior and inadequate legal representation (if you can even call it that) as compared to her male counterparts at Fox News.  Quite simply, the Fox News Attorneys coerced, intimidated, and misinformed Ms. Grossberg as they "prepared" her in connection with deposition testimony she gave in the pending defamation case brought by the company known as Dominion, titled *U.S. Dominion, Inc. v. Fox News Network, LLC*, N21C-03-257 (Del. Sup. Ct. Mar. 26, 2021) ("*Dominion*"), resulting in irretrievable reputational and emotional harm.

6.      Then, as if Fox News could not act any more unlawfully, the Network *sued* Ms. Grossberg in an effort to silence her from telling her story in this lawsuit minutes after she refused to agree to settle her claims alleged herein on Fox News's terms.  There could hardly be a more vivid and clear example of unlawful retaliation.

7.      Except Fox News did, in fact, top its illicit behavior just hours later, as it abruptly placed Ms. Grossberg on ***forced administrative leave***, effectively ending her career at the Network, in a blatant display of unlawful retaliation.

8.      Finally, brazenly, and unlawfully, Fox News, hammered the final nail into the coffin of Ms. Grossberg's once-promising career in television journalism by publicly terminating her employment for allegedly being insubordinate for publicly disclosing the woefully inadequate and likely malicious "legal advice" given to her by Fox News Attorneys prior to and during her deposition in the Dominion/Fox Lawsuit.

9.      Unfortunately for Fox News, Ms. Grossberg refuses to be silenced, and brings this case to obtain vindication for Fox News's flagrant violations of her rights under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), FMLA, 29 U.S.C. § 2615(a) ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law, §§ 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, Admin. Code §§ 8-107, *et seq.* ("NYCHRL"), the New York Equal Pay Act, New York Labor Law § 194 ("NYEPA"), New York Civil Rights Law § 70-a, and abuse of process under New York common law.

## JURISDICTION AND VENUE

10.      This Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1367(a) as Plaintiff is asserting claims under the Federal Equal Pay Act.

11.      The Court has supplemental jurisdiction over Plaintiff's state and city law claims as those claims are so related to the claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

12.      Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant Fox News resides in New York, New York, and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

13.     Simultaneously with the filing of this action, Plaintiff has filed/will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in connection with her claims of gender/sex, religion, and disability discrimination as alleged herein pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*

14.     Once the EEOC has concluded its investigation and/or issues Plaintiff a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add causes of action under Title VII and the ADA against Fox News.

15.     Further, simultaneously with the filing of this Complaint, Plaintiff will serve a copy of this Amended Complaint on the New York City Law Department, New York State Attorney General, and the New York City Human Rights Commission[2] to fulfill any and all administrative prerequisites with respect to her NYSHRL and NYCHRL claims alleged herein.

## THE PARTIES

16.     Plaintiff Abby Grossberg is an adult resident of New York County, New York, who was, during all times relevant to the Dominion/Fox Lawsuit until her termination on March 24, 2023, employed by Defendant Fox News Network LLC.  In retaliation for filing this action, Fox News terminated Ms. Grossberg's employment on March 24, 2023.

17.     Defendant Fox Corporation is a corporation formed under Delaware law and headquartered in New York, New York.  Fox Corporation is a publicly traded corporation listed

---

[2]  In June 2021, Fox News paid a $1 million fine to the New York City Human Rights Commission to settle claims of widespread sexual misconduct, the highest fine ever ordered by the Commission for violations of the New York City Human Rights Law.

on the Nasdaq stock exchange and is the parent company of Defendant Fox News Network LLC, which comprises most of its profits.   According to the New York Times, Fox News Network LLC generated $899 million in pretax income in 2020, accounting for 95 percent of Fox Corporation's total pretax profit.[3]

18.     Defendant Fox News Network LLC is, upon information and belief, one of the most powerful and far-reaching news organizations in the world.  Fox News Network LLC operates, among other things, the Fox News Channel, a 24-hour cable news station reaching about 90 million U.S. homes.  Fox News averages over three million viewers during its primetime evening news programs and nearly two million daytime viewers.  Fox News Network LLC is a limited liability company organized under the laws of Delaware, with a principal place of business in New York, New York.

19.     For ease of reference, unless stated otherwise, the two Entity Defendants are collectively referred to herein as "Fox News."

20.     While not currently named as defendants herein, the Chief Executive Officer ("CEO") of Fox Corporation, Lachlan Murdoch, and the CEO of Fox News Network LLC, Suzanne Scott, may become named defendants based upon discovery yet to be adduced in this action concerning their involvement with respect to Plaintiff's claims and the corporate and economic relationships between the two Entity Defendants.  It stands to reason that because of the overwhelming importance of Fox News Network LLC's results (*i.e.*, 95% of Fox Corporation's profits), Lachlan Murdoch plays a direct role in the management of Fox News Network LLC.  On information and belief, all important hiring and firing decisions and all internal significant personnel-related investigations at Fox News are vetted by him, and no decisions, including

---

[3] N.Y. TIMES, *Fox News Profits Grow Even As Viewership Declines,* Oct. 21, 2021, *available at* https://www.nytimes.com/live/2021/05/05/business/stock-market-today (last accessed on Mar. 20, 2023).

whether to protect senior Fox News talent, retaliate against victims or opponents of sexual harassment, or encourage, condone, and or abet sexual misconduct or harassment by senior Fox News executives, can be made without his approval in collaboration with Ms. Scott.

21.    Moreover, as the CEO of Fox Corporation, Lachlan Murdoch is required to provide certifications under the Sarbanes-Oxley Act as to the truthfulness of the company's financial disclosures, which must address the company's sexual harassment and misconduct lawsuits.[4] To be able to certify these documents, Lachlan Murdoch is required to regularly communicate with Fox News's operational team, including Ms. Scott, and Fox News's auditors and attorneys, and to ensure that complaints from local agencies such as the New York City Human Rights Commission ("NYCHRC") and New York State Division of Human Rights ("NYSDHR") lead to the strengthening of Fox News's internal controls in place to investigate, prevent, and remedy significant reputational risks resulting from Fox News's tolerance and condoning of sexual harassment, assault, and other gender-based discrimination or retaliation antithetical to the #MeToo movement.  In this context, Lachlan Murdoch, along with Ms. Scott, likely bear ultimate corporate responsibility for the negligent supervision and retention of personalities with a known propensity to create a hostile working environment for the women of Fox News.

22.    Defendant Jerry Andrews is a Senior Executive Producer of Weekend News at Fox. At all relevant times, Mr. Andrews has been an agent of Fox News, and has had authority to make decisions impacting Ms. Grossberg's employment. Upon information and belief, Defendant Andrews is a resident of the State of New York.

---

[4] *See* United States Securities and Exchange Commission, Form 10-K, Fox Corporation *available at* https://investor.foxcorporation.com/static-files/f0672f32-33a9-44b4-ae68-6b4b74590111, at 96 (disclosing sex-based litigation and investigations).

23.     Defendant Tucker Carlson is a Fox News television personality and the host of Fox News's *Tucker Carlson Tonight* ("TCT") program.  In February 2021, Mr. Carlson renewed a multi-year contract, reportedly valued at $10 million per year.  Mr. Carlson's program holds Fox News's premier 8:00 p.m. primetime weekday slot, and, to date, *Tucker Carlson Tonight* has been the highest rated cable news program in 2023.  At all relevant times, Mr. Carlson has been an agent of Fox News, and has had the authority to make decisions impacting Ms. Grossberg's employment.  Upon information and belief, Defendant Carlson is a resident of the State of New York.

24.     Defendant David Clark is a Senior Vice President, Weekend News and Programming at Fox News.  At all relevant times, Mr. Clark has been an agent of Fox News, and has had authority to make decisions impacting Ms. Grossberg's employment.  Upon information and belief, Defendant Clark is a resident of the State of New York.

25.     Defendant Ralph Giordano is a Vice President of News Coverage at Fox Business Network, another television channel owned by Fox Corporation.  At all relevant times, Mr. Giordano has been an agent of Fox News, and has had the authority to make decisions regarding Ms. Grossberg's employment.  Upon information and belief, Defendant Giordano is a resident of the State of New York.

26.     Defendant Justin Wells is a Senior Executive Producer and Vice President of TCT and Tucker Carlson Digital Products, an entity that, among other things, produces documentaries and other content created by Mr. Carlson.  It has been reported that "[Mr.] Wells, as a gay man, only emboldens Carlson further.  He gives him permission to launch the ugly attacks and helps Carlson validate, for himself (and likely for executives at Fox News), the vitriol he espouses.  That makes Justin Wells' presence as the powerful gay man behind Tucker Carlson all the more

newsworthy.  And all the more dangerous." [5] At all relevant times, Mr. Wells has been an agent of Fox News, and has had the authority to make decisions impacting Ms. Grossberg's employment. Upon information and belief, Defendant Wells is a resident of the State of New York.

27.    Defendant Thomas Fox is a Senior Producer for *Tucker Carlson Tonight*.  At all relevant times, Mr. Fox has been an agent of Fox News, and has had the authority to make decisions regarding Ms. Grossberg's employment.  Upon information and belief, Defendant Fox is a resident of the State of New York.

28.    Defendant Alexander McCaskill is a Managing Editor and Senior Producer for *Tucker Carlson Tonight.*  At all relevant times, Mr. McCaskill has been an agent of Fox News, and has had authority to make decisions regarding Ms. Grossberg's employment.  Upon information and belief, Defendant McCaskill is a resident of the City of New York.

29.    Defendant Lesley West is a Senior Vice President, Legal & Business Affairs at Fox News.  At all relevant times, Ms. West has been an agent of Fox News, and has had authority to make decisions regarding Ms. Grossberg's employment.  Upon information and belief, Defendant West is a resident of the State of New York.

## **STATEMENT OF FACTS**

**I.    The Misogynistic Culture Entrenched at Fox News Has Led to the Abuse, Harassment, And Silencing of Countless Women Who Have Worked There, And Ms. Grossberg Is Simply the Latest Victim.**

30.    The information set forth in this section is alleged upon information and belief and based on reports from reputable news agencies and recently filed lawsuits against Fox News.

---

[5] Michaelangelo Signorile, THE SIGNORILE REPORT, *The Powerful gay man behind Tucker Carlson's Bloodcurdling Hate*, Nov. 29, 2022, *available* at https://signorile.substack.com/p/the-powerful-gay-man-behind-tucker (last accessed on Mar. 20, 2023).

31.     Despite having to pay out *hundreds of millions of dollars* in settlements related to claims of sex discrimination, Fox News has persistently, to this day, been plagued with vivid examples of blatant sexual harassment and gender discrimination – two terms that have become deeply stitched into the fabric of Fox News's workplace culture — that permeates the airwaves, with little to no remediation.  Historically, when women have exercised their legal right to demand a workplace free of harassment and retaliation, Fox News has conducted sham investigations to cover up the wrongdoing of powerful men, including Mr. Carlson, and his predecessor, Bill O'Reilly.  Here are just some of the examples from recent years:

32.     **2004:** Fox News's then-top-rated host Bill O'Reilly purportedly settled a sexual harassment claim from former producer Andrea Mackris.  After Ms. Mackris complained about his conduct, Fox News and Mr. O'Reilly filed a lawsuit against *her* for extortion.  She countersued, alleging that Mr. O'Reilly made unwanted sexual advances and lewd comments in a series of phone calls and dinner conversations.  Mr. O'Reilly and/or Fox News reportedly paid Ms. Mackris $9 million to settle her claims.

33.     **2007:** Fox News correspondent Catherine Herridge made several complaints to senior executives regarding employment practices she believed were discriminatory based on gender and age.  Fox News executive Dianne Brandi purportedly investigated these claims but later notified Ms. Herridge that no evidence of discrimination was found.  When Ms. Herridge's employment contract was up for renewal in 2008, Ms. Brandi allegedly attempted to include new language in the contract that would preclude Ms. Herridge from bringing a discrimination complaint in the future.  As a result of Fox News's refusal to provide Ms. Herridge with a new employment contract that excluded the unlawfully retaliatory language, the Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Fox for unlawful retaliation.

34.     **2011:** Rebecca Gomez Diamond, a former host on the Fox Business Network, allegedly received a settlement payment from Mr. O'Reilly after she bought sexual harassment claims against him.  Ms. Gomez Diamond reportedly had sexually explicit recordings of Mr. O'Reilly.

35.     **2014:** Gabriel Sherman released his biography of the former Chairman and CEO of Fox News, Roger Ailes, which included an interview with a female Producer named Randi Harrison who claimed that Mr. Ailes offered her a $400-a-week job at NBC for *quid pro quo* sex: "If you agree to have sex with me whenever I want, I will add an extra hundred dollars a week."

36.     **2015:** Three female makeup artists at Fox News, Lena Jemmott, Hilda Correa-LaPolla, and Maureen Walsh, filed a complaint with the EEOC in which they accused Fox News of discriminating against them based on their gender.

37.     **July 2016:** Former Fox News anchor Gretchen Carlson sued Mr. Ailes, accusing him of sexual harassment.  Ms. Carlson's charges, which included the accusation that Mr. Ailes tried to use his stature at Fox News to cajole her into a sexual relationship, spurred several similar allegations against Mr. Ailes.  21st Century Fox reportedly spent $20 million to settle with Ms. Carlson, and Fox News publicly apologized "for the fact that Gretchen was not treated with the respect and dignity that she and all of our colleagues deserve."

38.     **July 2016:** Former Fox News reporter Rudi Bakhtiar claimed that she was fired by Mr. Ailes after she told him that she had been sexually harassed in the past by the company's incoming Washington D.C. bureau chief Brian Wilson.  An arbitrator reportedly held in favor of Ms. Bakhtiar and directed Fox News to pay Ms. Bakhtiar damages as well as her legal fees.

39.     **July 2016:** Mr. Sherman interviewed several more women who alleged that Mr. Ailes sexually harassed them, including former Republican National Committee field adviser

Kellie Boyle, who said that Mr. Ailes propositioned her in 1989, and Marsha Callahan, a former fashion model, who said Mr. Ailes sexually harassed her in the late 1960's.

40.    **July 2016:** After approximately two dozen female employees at Fox News accused Mr. Ailes of sexual harassment and/or retaliation, Mr. Ailes was finally forced to resign.  However, in former Fox Corporation's CEO Rupert Murdoch's public statement regarding Mr. Ailes's resignation, he thanked Mr. Ailes for his "remarkable contribution" to the network, disregarding the pain and suffering he caused his many victims.  Indeed, Mr. Ailes allegedly received $40 million from Fox News in connection with his departure and remained a consultant until his passing in 2017.  Thereafter, rather than clean house, Mr. Murdoch retained Mr. Ailes's two most loyal lieutenants – Bill Shine and Suzanne Scott – who actively condoned, perpetuated, and covered up the rampant incidents of sexual harassment and sexual assault at Fox News.

41.    **July 2016:** Former Fox News Director of Booking Laurie Luhn told New York Magazine that Mr. Ailes "psychologically tortured" her for twenty years by coercing her to provide him with sexual favors in exchange for career advancement opportunities.  Even though Ms. Luhn allegedly signed a $3.15 million settlement agreement with Fox News that included very strict nondisclosure provisions, she nevertheless went public with her story.

42.    **August 2016:** Former Fox News Host Laurie Dhue claimed she was sexually harassed by Mr. Ailes, alleging that Mr. Ailes asked her if she was wearing underwear while she was jumping on a trampoline with his son.

43.    **August 2016:** Fox News Host Andrea Tantaros filed a lawsuit against Fox News, Mr. Ailes, and several other senior executives, including Ms. Scott.  Ms. Tantaros accused Fox News of retaliating against her after she complained of sexual harassment.

44.     **September 2016**: Fox News promoted Mr. Shine to Co-President even after he was accused in multiple lawsuits of covering up incidents of sexual harassment at Fox News by routinely dismissing the concerns of the women who complained about the unlawful conduct.  Mr. Shine, described as Mr. Ailes's "foot soldier," "right-hand man," and "unofficial policeman," reportedly shared the same sexist attitudes as Mr. Ailes, and once publicly praised TV personality Elisabeth Hasselbeck for projecting the image "that after the show, Elisabeth's going home and she is changing a couple of diapers" instead of "writing books and doing book tours."

45.     **November 2016:** Former Fox News Anchor Megyn Kelly released her memoir, *Settle for More*, in which she alleged that Mr. Ailes sexually harassed her during her time at Fox News.  Mr. O'Reilly publicly belittled and dismissed Ms. Kelly's allegations regarding Mr. Ailes.  Ms. Kelly later emailed Fox News executives to report that Mr. O'Reilly was intimidating female victims who have the right to come forward.  In response, Mr. Shine apparently promised to talk to Mr. O'Reilly, but Mr. O'Reilly later announced on his show, *The O'Reilly Factor*, that ***"women [at Fox News] should not complain about sexual harassment because it undermines their employer."***

46.     **December 2016:** Fox 5 Reporter, Lidija Ujkic (known as Lidia Curunaj), filed a gender-based discrimination and hostile work environment suit against 21st Century Fox, Fox Entertainment Group LLC, Fox Television Studios LLC, and News Director Byron Harman.  Her allegations included reports that Mr. Ailes had sexually harassed her.

47.     **January 2017:** Reports emerged that 21st Century Fox executives had settled claims brought by longtime broadcaster, Juliet Huddy, who had come forward with similar sexual harassment accusations against Mr. O'Reilly.

48.     **January 2017**: Ms. Correa-LaPolla and Ms. Maureen Walsh filed a lawsuit against Fox News, alleging that they were discriminatorily and retaliatorily fired after complaining about the troubling "locker room" climate at the company in which where women were objectified and made to feel that they were "only to be seen and not heard."

49.     **February 2017**: Fox News gave Mr. O'Reilly a four-year extension on his contract, agreeing to pay him $25 million per year, and vowing to stand by him through thick and thin even though the company knew, and had contributed to, at least six settlements with Mr. O'Reilly's alleged victims of sexual harassment — including one for $32 million dollars.

50.     **April 2017**: Former Fox News Political Commentator Julie Roginsky filed a lawsuit claiming Mr. Ailes sexually harassed her while promising her a big promotion.  Ms. Roginsky also alleged that after Ms. Carlson filed her lawsuit, Ms. Scott sought to recruit Fox News employees and contributors to retaliate against Ms. Carlson by publicly disparaging her and supporting "Team Roger."

51.     **April 2017**: Dr. Wendy Walsh (a psychologist and radio tv personality), Perquita Burgess (a Fox News clerical worker), and Dr. Caroline Heldman (an Associate Professor of Politics and political commentator) came forward with detailed allegations of sexual harassment against Mr. O'Reilly.  Mr. O'Reilly subsequently resigned but is believed to have received a payout of approximately $25 million.  Ultimately, Fox News released the following statement regarding Mr. O'Reilly: "After a thorough and careful review of the allegations, the company and Bill O'Reilly have agreed that Bill O'Reilly will not be returning to the Fox News Channel." In place of *The O'Reilly Factor*, Fox News moved *Tucker Carlson Tonight* to the coveted primetime 8:00 PM slot.

52.     **April 2017**: Ms. Tantaros filed a second lawsuit against Fox News alleging illegal electronic surveillance and online harassment.

53.     **May 2017:** Reporter Diana Falzone sued Fox News claiming discrimination based on gender and disability.  Her case was reportedly settled for an undisclosed amount.  As a condition of the settlement, Fox News required Ms. Falzone to sign an NDA preventing her from disclosing information about her time at Fox News — including a story she had written about then-Presidential candidate Donald Trump's sexual relationship with Stephanie Clifford (a.k.a. Stormy Daniels), which Ms. Falzone's bosses told her to not publish.  Ms. Falzone was later called to testify in front of the House Oversight Committee investigating whether Fox News had suppressed negative stories about Mr. Trump before the 2016 presidential election.

54.     **May 2017**: Ms. Scott replaced Mr. Shine as CEO of Fox News and Fox Business Network, despite being identified in numerous sexual harassment lawsuits as having silenced female employees at Fox News who complained about sexual harassment and other gender-based discrimination and retaliation.  Specifically, it is reported that Ms. Scott retaliated against women who made sexual harassment complaints and enabled the hostile and demeaning work environment for female talent.  National Public Radio ("NPR") reported that a Fox News staffer said that *Ms. Scott was "worse than Shine" in deflecting concerns of women.*

55.     **July-September 2017**: Host of Fox Business Channel's *Making Money* program Charles Payne was accused of sexual harassment and sexual assault but remained on the airwaves following a brief suspension after he was purportedly cleared by an internal investigation.

56.     **September 2017:** Eric Bolling, host of *Fox News Specialists,* was fired after sending unsolicited photos of male genitalia to female colleagues.  Rather than condemn his actions, Fox News released this statement: "Eric Bolling and Fox have agreed to part ways

amicably.  We thank Eric for his ten years of service to our loyal viewers and wish him the best of luck."

57.     **October 2017:** Reports emerged that Mr. O'Reilly paid former Fox News legal analyst Lis Wiehl $32 million dollars to settle her claims of sexual harassment against him.  Ms. Kelly publicly declared that Mr. O'Reilly was making false assertions related to the complaints against him, and that Fox News executives continued to retaliate against women for reporting sexual harassment and discrimination.  Specifically, Ms. Kelly said: ***"This must stop, the abuse of women, the shaming of them, the threatening, the retaliation, the silencing of them after the fact — it has to stop."***

58.     **November 2017:** 21st Century Fox reached a $90 million dollar settlement in a shareholder derivative action arising from claims that the company had allowed pervasive racial and sexual harassment in the workplace, which resulted in reputational and financial harm to the corporation.

59.     **December 2017**: Rupert Murdoch, former Chairman and CEO of Fox Corporation, casually dismissed all sexual harassment allegations at Fox News as "nonsense. . . [and] largely political because we are conservative," even though many of the female victims also identified as politically conservative.  Mr. Murdoch also claimed that the allegations against Mr. Ailes were "isolated incidents" and that "there has been nothing else" since his ouster.  Contemporaneously, approximately ten former and current Fox News employees told The Huffington Post that Mr. Murdoch's comment was a blatant lie: "I have had to put up with a hostile work environment for years, and now I'm told that it doesn't exist by a man who doesn't have to walk these halls every day?"

60.     **March 2019:** An audio clip of Mr. Carlson emerged in which he says: (a) arranged marriages between adults and children are not "the same thing exactly as pulling a child from a bus stop and sexually assaulting that child.... The rapist in this case has made a lifelong commitment to live and take care of the person, so it is a little different"; (b) sex workers are "slutty and pathetic"; (c) women are "***extremely primitive, they're basic, they're not that hard to understand***"; and (d) in response to a story about girls at his fourteen-year-old daughter's boarding school experimenting sexually with each other, Mr. Carlson opined: "If it weren't my daughter, I would love that scenario."

61.     Shockingly, Fox News did not order Mr. Carlson to apologize for the offensive remarks.  Rather, Mr. Carlson said on air: "Rather than express the usual ritual contrition, how about this: I'm on television every weeknight live for an hour.  If you want to know what I think, you can watch.  Anyone who disagrees with my views is welcome to come on and explain why."

62.     Dan Gallo, a Fox News Producer subsequently complained to Kevin Lord, Executive Vice President and Chief Human Resources Officer, about the recordings of Mr. Carlson defending statutory rape because he believed such vitriol created an unsafe workplace for female employees.  Reportedly, Mr. Gallo was later confronted by Mr. Carlson and bullied into not pressing the matter further.  Indeed, no further investigation was conducted regarding Mr. Carlson's remarkably disturbing comments, nor did Fox News issue any public statement condemning Mr. Carlson's remarks, while Mr. Carlson later brushed off criticism of his comments as "bewildering."

63.     **August 2019**: Days after a 21-year-old white man killed 22 people at an El Paso, Texas Walmart to "protest" what he called the "Hispanic invasion of Texas," Mr. Carlson declared on the air that white supremacy was largely a "hoax."  In response, Cristina Corbin, a Fox News

Producer, tweeted an indirect rejoinder to the prime-time star: "White supremacy is real, as evidenced by fact." Several hours later, Mr. Carlson reportedly called Ms. Corbin from a blocked number and told her in front of her coworkers to: "***Shut your mouth***."

64.     **December 2019:** Brittany McHenry filed a lawsuit alleging sexual harassment against her Co-Host, George Murdoch (no relation to Rupert Murdoch), after he threatened to send her a "dick pic" over text message and told her he liked her buttocks and legs, speculating about what it would be like to have sex with Ms. McHenry.  Ms. McHenry alleged that she complained numerous times to Fox News HR and management about this violative conduct, but no investigation of her claims ever took place, and instead, she was excluded from work-related events and ultimately blacklisted from appearing on Fox News.

65.     Reportedly, Ms. Mekeel asked Ms. McHenry what she had done to "provoke" George Murdoch as part of her subsequent "investigation."   Fox News eventually closed its investigation and concluded that George Murdoch's conduct did not constitute sexual harassment because there was no "clear intent to have sex" with Ms. McHenry.   Clearly the #metoo movement's slogan, "Believe All Women," had not made its way to Fox News.  George Murdoch was never disciplined by Fox News, but was given his own show on the Fox Nation streaming service, in addition to being permitted to continue appearing as a regular guest on *The Greg Gutfeld Show* and fill-in host on *The Five*, decisions in which Ms. Scott reportedly had significant involvement.

66.     **July 2020:** Jennifer Eckhart, a former Associate Producer, filed a lawsuit against Ed Henry, co-host of *America's Newsroom*, and Fox News, claiming that: (a) she was sexually harassed, sexually assaulted, and raped by Mr. Henry; and (b) after she complained to HR, she was fired.

67.    **July 2020:** Blake Neff, a senior Writer for TCT, resigned after several racist and sexist comments that he posted on AutoAdmit (a message board notorious for vulgar and offensive content) under the pseudonym "CharlesXII" came to light.  Mr. Neff had allegedly been posting brazenly sexist and racist comments for years, including a lengthy thread mocking a woman with whom he was "friends" on Facebook s an "Azn mega-shrew," which led other users on the message board to abuse the woman for years with nearly 1,000 derogatory follow-up posts. Mr. Carlson still called Mr. Neff a "wonderful writer" in an appearance on *The Five*.

68.    While Ms. Scott publicly condemned the "horrific racist, misogynistic and homophobic behavior," claimed "actions such as his cannot and will not be tolerated at any time in any part of our work force," and said that "Tucker will be addressing this on his show," Lachlan Murdoch approved Mr. Carlson's defensive remarks, which including the following statement: "we should also point out to the ghouls now beating their chests and triumph of the destruction of a young man that self-righteousness also has its costs."  Notably, Mr. Carlson never acknowledged the nature of Mr. Neff's racist and sexist online comments, nor did he explain that Mr. Neff had been making such posts up until a week prior to when his horrific conduct came to light.

69.    **March 2021:** The Pentagon's press secretary, John F. Kirby, and several senior members of the U.S. military, publicly condemned Mr. Carlson for a sexist segment on TCT in which he mocked women serving in the armed forces and ridiculed changes by the military to be more inclusive to women.  Specifically, Mr. Carlson had stated: "So we've got new hairstyles and maternity flight suits — ***pregnant women are going to fight our wars…It's a mockery of the U.S. military.***"

70.    **June 2021:** Fox News paid a $1 million fine to the New York City Human Rights Commission to settle claims of widespread sexual misconduct, the highest fine ever ordered by

the Commission for violations of the New York City Human Rights Law.  The settlement required Fox News to not enforce mandatory arbitration clauses related to New York City Human Rights Law claims against its employees for four years, provide Commission-approved harassment and bystander training, and implement (for at least two years) a policy and complaint procedure for reporting discrimination and harassment complaints with multiple levels of review.  According to the NYCHRC's press release, "***any further violations that occur during this period will be considered succeeding violations and additional penalties will be assessed accordingly.***"

71.     **June 2022:** Fox News reportedly paid $15 million to settle allegations of pay disparity based on gender by former host Melissa Francis, who was allegedly fired after she raised concerns. Ms. Francis had filed a complaint with New York State Department of Labor "not for herself but for the women of the company who remain behind."

72.     **March 2023:** Plaintiff Abby Grossberg files the instant action.

73.     The foregoing clearly establishes a widespread pattern and practice at Fox News of supporting its male on-air talent and executives in the face of sexist, misogynistic, discriminatory, or retaliatory conduct and comments.  Thus, it is no wonder, against this backdrop, that Ms. Grossberg's harassers felt emboldened to mistreat her with impunity.

II.     **Ms. Grossberg's Illustrious Career in Primetime Journalism Leads Fox News to Recruit and Hire Her to Join the Network Wherein She Builds on Her Professional and Ratings Success.**

74.     Ms. Grossberg joined Fox News in 2019 with over 16 years of experience in broadcast journalism.  After graduating in 2003 from Johns Hopkins University, Ms. Grossberg began her journalism career at CBS News, before moving to take on roles with increasing responsibility at CNN, NBC Universal, and most recently, ABC News, where she was the producer of *World News Tonight with David Muir* for three years.  In this role, Ms. Grossberg pitched

original story ideas, wrote scripts, and oversaw the production and editing of news packages from inception to air, often on a very tight deadline.

75.     At ABC News, Ms. Grossberg worked with a wide range of anchors, correspondents, and senior staffers on day-of-air pieces about the latest breaking news. Additionally, Ms. Grossberg booked guests, created graphics, and fact-checked editorial content. She also coordinated with bureau chiefs and desk editors to launch featured pieces and mentored junior staff regarding the research, booking, and production of such stories.

76.     In or about March 2019, Ms. Grossberg joined Fox News as a Senior Booking Producer for *Sunday Morning Futures with Maria Bartiromo* ("SMFMB").   Ms. Grossberg immediately assumed exclusive responsibility for creating and producing the weekly live one-hour program that was consistently rated the #1 Sunday cable news show.

77.     As part of her duties, Ms. Grossberg determined editorial content and handled all guest bookings, in collaboration with host, Maria Bartiromo.  In that vein, Ms. Grossberg booked, produced, and wrote scripts for all guest segments, and oversaw SMFMB's control room team regarding logistics, graphics, promotions, and general show elements.

78.     After only three months under Ms. Grossberg's leadership, SMFMB's ratings grew impressively by 40% – *i.e.*, from 1.5 million on October 7, 2019, to 2.2 million on January 5, 2020, becoming the number one weekend show on the Network.

**III.    Ms. Grossberg Experiences a Hostile Work Environment on the Basis of Sex Almost Immediately and Observes the Persistent Attempts by Male Colleagues to Marginalize Ms. Bartiromo, Whom They Call (Among Other Things) "Crazy," "Menopausal," "Hysterical," and a "Diva," and Ms. Grossberg Herself is Denied the <u>Title of Senior Producer, For Which She was Qualified.</u>**

79.     Within a month of her hire, Ms. Grossberg encountered systemic chauvinism at Fox News.  For example, in or about April 2019, Matt Kaulbach, a Senior Producer on SMFMB,

drunkenly scolded Ms. Grossberg during work hours for sharing too much information with Ms. Bartiromo because – according to Mr. Kaulbach, -- Ms. Bartiromo was *"crazy," "menopausal,"* and often became *"hysterical."*

80.     Mr. Kaulbach further informed Ms. Grossberg that David Clark had instructed him, *"the less [Ms. Bartiromo] knows the better."*

81.     When Ms. Grossberg informed Ms. Bartiromo of what Mr. Kaulbach had said, Ms. Bartiromo responded that she believed both men were sexist, and that she did not "trust" either of them.

82.     Ms. Bartiromo also lamented to Ms. Grossberg that she "used to be a star," but since joining Fox News, had been devalued as being "past her prime" by her male colleagues and superiors, who favored younger women.

83.     Ms. Bartiromo stated to Ms. Grossberg that she sincerely believed that Mr. Clark was "out to sabotage her," which was validated by the way Mr. Clark spoke about her — i.e., calling her a *"diva" who was "difficult" and "demanding" and who needed to be "controlled."*

84.     Subsequently, later that month, Mr. Kaulbach went on a leave of absence and Ms. Grossberg assumed his responsibilities.  Mr. Kaulbach returned to work a few months later, but his parroting of the sexist rhetoric from the senior executives continued unabated.

85.     Ultimately, Mr. Kaulbach resigned in October 2019.  Ms. Grossberg, once again, took over his editorial duties and proceeded to successfully grow SMFMB's viewership.

86.     In or about November 2019, shortly after Mr. Kaulbach's rather sudden departure, Mr. Clark called Ms. Grossberg into his office, and told her "not to worry," because he was searching for someone to replace Mr. Kaulbach.

87.     Ms. Grossberg responded to Mr. Clark that he need not look further because she wanted the job and was, in fact, already doing it successfully.  Mr. Clark echoed the refrain that ***Ms. Bartiromo was "crazy," and that Ms. Grossberg was not capable of managing her.***

88.     Mr. Clark then stated, point blank, to Ms. Grossberg that ***Mr. Kaulbach's position needed to be filled by someone "like [Mr. Kaulbach]" – i.e., a man.***

89.     Days later, on November 13, 2019, Mr. Clark, in front of various staffers, including Ms. Grossberg, again proclaimed that the position vacated by Mr. Kaulbach with be filled by a man.  Mr. Clark asked Marc Smith, a field producer on *Maria Bartiromo's Wall Street* program, whether he was interested in the position, or knew of anyone who may be interested, while looking right in Ms. Grossberg's direction.

90.     Ms. Grossberg felt humiliated and demoralized to be so obviously disregarded and dismissed by Mr. Clark, as he offered the position to someone with less experience and lower ranking than her.

91.     On or about November 15, 2019, Ms. Grossberg informed Ms. Bartiromo that she believed she was being passed over for the position previously held by Mr. Kaulbach – a position she was presently performing in Mr. Kaulbach's absence – simply because of her gender.

92.     When Ms. Grossberg elaborated to Ms. Bartiromo that she felt embarrassed and humiliated that the position was shopped around to men, Ms. Bartiromo explained that it was because Mr. Clark did not like that "two strong women" were being credited with SMFMB's success.

93.     Specifically, Ms. Bartiromo told Ms. Grossberg that Mr. Clark was jealous that Ms. Bartiromo and Ms. Grossberg had hit it off so well and were working together as a team.

94.     The sexist tropes against Ms. Bartiromo continued when, on December 12, 2021, her first day back in the Control Room after working from home due to the COVID-19 pandemic, Ms. Grossberg witnessed David Hoffman, a Weekend Show Director for Fox News, call Ms. Bartiromo a *"crazy bitch"* before telling Ms. Grossberg that she should have "stayed home in [her] fancy house and expensive slippers just like Maria [Bartiromo]."

95.     In other words, according to Mr. Hoffman, a woman's place is in the home, albeit with slippers on and not just barefoot.

96.     Indeed, after learning that Christopher Faulkner, a floating producer, had plagiarized guest introductions in 2020, Ms. Grossberg took over the tasks of writing the scripts, planning the segments, and timing the show.  On July 24, 2020, Ms. Bartiromo confided in Ms. Grossberg her frustration that Mr. Faulkner "constantly messes w scripts & trips me up live & other dumb mistakes."  On August 16, 2020, Ms. Grossberg described Mr. Faulkner's nonchalant attitude about plagiarism to Ms. Bartiromo, saying "I said to Chris [Faulkner] this is unacceptable, he said 'well, unfortunately, it happens most of the time.' I said well it's plagiarism and means I have to literally write everything with zero help. Silence."

97.     Ms. Bartiromo often called Mr. Faulkner a "moron" "who continues to destroy this show," while she told Ms. Grossberg "you run this show period." On February 14, 2021, Ms. Bartiromo addressed her concerns with Mr. Faulkner directly about there being "quite a few issues today," and asked to have a call "to better understand why there are so many mistakes."  "Christopher [Faulkner] will not get away with hijacking the show. No[r] will Jerry [Andrews]. I will make a huge stink." When Mr. Faulkner later mistimed a show pre-taping by ten minutes — a colossal miscalculation by industry standards — Ms. Bartiromo told Ms.

Grossberg, "Thanks for fixing the show. We need to discuss what we shou[l]d do about help. Demand Grace or a diff line producer."

98.     Although Fox News's position, upon information and belief, is that Ms. Grossberg was not qualified for the Senior or Executive Producer title because she lacked line producer and control room experience, Ms. Grossberg did in fact train and learn how to line produce, until Jerry Andrews told her that was "dumb" and "not her path.

**IV.   Fox News Discriminates Against Ms. Grossberg Because of Her Sex by Failing to Hire Support Staff for, or Provide Resources to, Her Commensurate with Her Similarly Situated Male Colleagues at Shows Starring Men, as well as Failing to Promote Her to Executive Producer.**

99.     Ultimately, as the *only* Fox News employee assigned to work exclusively on *Sunday Morning Futures with Maria Bartiromo,* Ms. Grossberg performed the functions of her own job, as well as that of an Executive Producer, but was never given an appropriate title or pay increase, despite making these requests repeatedly (from 2021 to 2023) to Ms. Bartiromo and Lauren Petterson, President of Fox Business & Talent.

100.      During this time, Ms. Grossberg also made numerous requests to Ms. Bartiromo and Ms. Petterson for additional support staff, but these requests were never fulfilled.

101.     Interestingly, upon information and belief, the ***male headlined weekend shows had significantly more dedicated staff than Ms. Bartiromo's then (1) and now (2)***. Dan Bongino & The Big Show had nine dedicated staff members that both shows shared; Media Buzz with Howard Kurtz had nine dedicated staff members; Sunday Night in America with Trey Gowdy had seven dedicated staff members; Fox News Sunday had six dedicated staff members; The Next Revolution with Steve Hilton had five dedicated staff members; and Life Liberty and Levin with Mark Levin had four dedicated staff members.

102.     In September 2021, Ms. Bartiromo **echoed Ms. Grossberg's concern that they have "no god damn help."** Ms. Bartiromo continued via text: "It's ridiculous that we do not have a PA [Production Assistant]. I'm sick & tired of this.  I have to be in NYC at 1130 & I threw myself into a pretzel to make sure SMF was excellent & time and time again we are working overtime trying to make th[i]s show excellent w no god damn help.  One issue [i]s that they do not understand what we are doing [a]nd how much work it is." Ms. Grossberg responded that the two women "need someone to handle the little things that eat up a lot of time.  Like sitting on the phone with a car company, or ordering a transcript.  I'm clearly not above doing anything, but it's ridiculous." **Ms. Bartiromo indicated that Chris Wallace and Jesse Watters had more dedicated employees on their shows, before stating: "…I need [L]auren [Petterson] or [S]uzanne [Scott] to give us a PA.  I sent it to [J]erry [Andrews] to try and give him a chance to look useful.  I also sent it to my agent.  He will demand [S]uzanne [Scott] take action."**

103.     On October 13, 2021, Ms. Grossberg again reiterated to Ms. Bartiromo that she needed more support, "realistically [I] don't have the bandwidth.  Editing a piece can take an entire day and it's just me + everything else." Ms. Bartiromo responded, "I just emailed everyone.  We need to get on this ASAP.  We need help & we need to ask for it now.  You a[r]e on the email w [L]auren [Petterson,] Jerry [Andrews] and Patrick [Ignozzi]."

104.     Later that day, Fox News posted a job opening for an Executive Producer of SMFMB — the job that Ms. Grossberg was already single-handedly doing without the title — and not for a Production Assistant, which the show desperately needed.  To Ms. Grossberg's dismay, Fox News executives then began sending prospective candidates, **all of whom were male**, to Ms. Bartiromo's personal assistants to vet.

105.    On November 11, 2021, Ms. Grossberg met with Ms. Petterson and inquired as to why she was not being considered for the Executive Producer role.

106.    In this meeting, Ms. Grossberg highlighted her attributes: (a) she got along well with Ms. Bartiromo: (b) she had already earned Ms. Bartiromo's trust; and (c) most importantly, the show's ratings were stellar despite her having to produce the show with almost no support staff.

107.    In response, Ms. Petterson inexplicably attacked Ms. Grossberg without warning by stating: "*everyone hates you, anytime your name comes up awful, disgusting and horrible things are said about you.*"

108.    Feeling blindsided, Ms. Grossberg asked for specifics, but Ms. Petterson declined to provide any, suggesting that Ms. Petterson was actually taking issue with Ms. Grossberg's decision to speak up about why she was being overlooked for the Executive Producer role.  Ms. Grossberg then asked Ms. Petterson whether the choice not to hire Ms. Grossberg for the vacant Executive Producer role was performance-based, and Ms. Petterson answered in the negative, affirming that "there's no denying you're talented," but it was just that Fox News needed someone who can "manage" Ms. Bartiromo, whatever that was supposed to mean.

109.    Curiously, Ms. Petterson then instructed Ms. Grossberg to seek out Ralph Giordano, Vice President of News Coverage at Fox Business Network, as a "mentor" (although Ms. Grossberg was not affiliated even with Fox Business Network) so Ms. Grossberg could gain more insight about the Executive Producer position.

110.    On November 19, 2021, Ms. Grossberg met with Mr. Giordano, but the meeting quickly turned into an intimidating and harassing opportunity for the male senior executive to heckle and manipulate Ms. Grossberg.

111.     Mr. Giordano admitted that SMFMB needed an Executive Producer, but chauvinistically stated the position "requires a lot" and that Ms. Grossberg "didn't understand the half of it." *Mr. Giordano then stated that Ms. Bartiromo was a "very difficult talent" whom he did "not like at all" because Ms. Bartiromo was "disgusting and difficult to manage."*

112.     During this conversation, Mr. Giordano strongly implied to Ms. Grossberg that because everyone hated Ms. Bartiromo, they would all soon hate Ms. Grossberg as well by association.

113.     In a non-sequitur, Mr. Giordano then brought up a lawsuit filed against Fox News by a company called Dominion Voting Systems alleging that Fox News defamed it by parroting baseless allegations about its voting machines and software allegedly being rigged against President Trump.  Mr. Giordano baselessly accused Ms. Grossberg of failing to air a full-screen disclaimer about Dominion's denial that its voting system had changed votes in the 2020 election, clearly setting it up so that Ms. Grossberg "takes the fall" for Fox News's improper and seemingly defamatory conduct.

114.     Even though Ms. Grossberg repeatedly assured Mr. Giordano that she had, in fact, run such a disclaimer, Mr. Giordano kept insisting that the Dominion lawsuit was the fault of Ms. Grossberg's "inability to manage a diva" – *i.e.*, to control Ms. Bartiromo.  What Mr. Giordano conveniently left out was how it was the higher ups in the network who approved baseless statements against Dominion to air repeatedly on Fox News to perpetuate the lie that President Trump had the election fraudulently stolen from him so that the Network pandered to Trump supporters/viewers.  Subsequently, Mr. Giordano then used his position of power to coerce Ms. Grossberg into spying on Ms. Bartiromo.  Specifically, Mr. Giordano told Ms. Grossberg that he

was "willing to give … [her] a chance" and that she could think of this "as a clean start" *if Ms. Grossberg reported back to him what Ms. Bartiromo was doing*.

115.    Indeed, Ms. Grossberg began attending the Friday morning meetings that Mr. Giordano, who was supposed to be her "mentor" in helping her advance at the Network, ran for Fox Business staffers, in which she had to disclose guests booked and anticipated editorial commentary for the Sunday show.  Ms. Grossberg was the only Fox News staffer in attendance at these meetings.

116.    Moreover, in the late Spring of 2022, Ms. Grossberg received her 2022 Performance Review from Mr. Andrews, which gave her an "Exceeds Expectations" overall rating, and positively commented that "Abby has always done a great job booking SMF and providing standout content for the show, and working well with Maria."

117.    Notwithstanding the foregoing, Ms. Grossberg was never given the Executive Producer title for SMFMB even though this was clearly her role on the show.

118.    In April 2022, Ms. Bartiromo expressed her disappointment and dismay with Fox News higher-ups' refusal to provide her with an Executive Producer and, more specifically, their rejection of Ms. Grossberg for the role.  When Ms. Petterson presented Ms. Bartiromo with resumes from less qualified candidates, Ms. Bartiromo advocated on Ms. Grossberg's behalf, saying "she does the whole show every week alone." Ms. Bartiromo told Ms. Petterson, "I don't understand what you're doing.  The show is soaring.  This show has never been stronger.  The ratings are every week, the tent pole of the network. … Why would you want to mess with it?" Ms. Bartiromo later told Ms. Grossberg that she believed the Network *wanted "to break us up"* because of the two women's "*solid partnership*" and the fact that Ms. Grossberg *was not "bowing" to their feet.*

29

119.    In May 2022, Ms. Bartiromo sent a text message to Ms. Grossberg saying: "*Amazing show Abby.  I am fighting for you and us, so we get the respect we deserve.*  I am on it.  Do not worry."  Ms. Grossberg responded by lamenting the fact that they were so short-staffed, and reiterating her belief that the understaffing both hurt the show and caused her unnecessary anxiety and stress that was detrimental to her health.

120.    During this period, Ms. Grossberg's mental health was only made worse by her realization that, unlike certain of her male counterparts – *e.g.*, Christopher Faulkner, a Floating Producer – she was not given any time off by Fox News.

121.    For example, on March 4, 2022, Ms. Grossberg called Jerry Andrews to inform him that her father was in the ICU after brain surgery and that she was too distraught to produce that day's show from her father's bedside.  Mr. Andrews's callously responded that unless she was able to get someone to cover for her, Ms. Grossberg had to do the work regardless of her circumstances.

**V.    Ms. Grossberg Witnesses the Same Sex-Based Inequality that Waylaid Her Career at the Highest Levels of Fox News, Where Male Anchors, Like Bret Baier and Chris Wallace, Were Revered on Pedestals as "Credible," While Female Anchors like Ms. Bartiromo and Judge Jeanine Pirro Were Castigated as "Crazy" or "Hysterical."**

122.    Upon information and belief, Fox News male executives (and Ms. Scott) have engaged in a pattern and/or practice of disparate treatment that favored male anchors, as well as their shows and staffs, more so than female anchors and their colleagues and endeavors.

123.     For example, Fox News shows with male anchors would often lift portions of interviews booked by Ms. Grossberg and conducted by Ms. Bartiromo without providing proper onscreen or verbal credit to SMFMB for breaking those key stories.

124.    This demeaning disparate treatment belittled Ms. Bartiromo's and Ms. Grossberg's hard work and effectively hijacked Ms. Bartiromo's reporting and Ms. Grossberg's production efforts for the benefit of their male colleagues.

125.    Ms. Grossberg was frequently restrained by her direct boss, Mr. Clark, who retained ultimate authority over what guests appeared on SMFMB.  Mr. Clark frequently communicated with the higher-ups which guests the Company can and cannot go on the airwaves.  For example, on November 18, 2019, Mr. Clark told Ms. Grossberg to hold off on booking John Solomon, whose reporting was being "investigated," until he could better understand how the situation "play[ed] out." Then again on November 7, 2020, Ms. Grossberg asked if the show should keep bringing Rudy Giuliani on as a guest, to which Mr. Clark replied, "yes." Mr. Clark's only concern was that Rudy Giuliani might criticize Fox News for what he alleged was the premature calling of the electoral votes of the state of Arizona as having went to Joe Biden, not about any alleged fraud committed by entities like Dominion who were involved in the voting process.

126.    Ms. Bartiromo, however, considered Mr. Clark a "liar," and believed his priority was "to sabotage" her SMFMB show.  As such, she cautioned Ms. Grossberg that, as two women, they "cannot get bullied by him" and should "stick together like a steel wall."

127.    For example, in late November 2020, Ms. Bartiromo secured President Trump's first interview after he lost the 2020 election.  Afterwards, Mr. Clark called Ms. Grossberg to tell her, dismissively, that "POTUS was just a space filler on a holiday weekend." Ms. Grossberg felt that this was yet another instance of Mr. Clark belittling her and Ms. Bartiromo's efforts.

128.    Simultaneously, other male colleagues, including Mr. Faulkner, asked Ms. Grossberg how Ms. Bartiromo was able to secure an interview with President Trump, and

questioned aloud why President Trump wouldn't go somewhere like "Hannity" – *i.e.*, a show hosted by a male anchor.

129.     Similarly, when conservative activist Charlie Kirk revealed the name of the Capitol police officer who shot and killed veteran Ashli Babbitt as she stormed the Capitol on January 6, 2021, for the first time on SMFMB, Fox News refused to post the breaking news clip on its website. Five days later, however, Ms. Petterson sent a text message to Ms. Bartiromo so that she was "not caught off guard," informing her that Chad Pergram, a male Senior Correspondent, would break the story and identify the officer's name on Fox News.

130.     Also in early January 2021, Ms. Scott released Fox News's plans for an updated television lineup, including a new opinion program in the 7:00pm slot entitled *Fox News Primetime,* which featured a rotating group of hosts until a permanent host was selected.  Ms. Bartiromo auditioned as the host on January 25-28, 2021, and again on March 15-19, 2021.

131.     When she was not chosen for the permanent host spot, Ms. Bartiromo confided in Ms. Grossberg that the "higher-ups" wanted Ms. Bartiromo to be a "puppet" and that she was being "set up to fail." Even though Ms. Petterson told Ms. Bartiromo that she was their top choice for the permeant host role, a man, Jesse Watters, was chosen instead.

132.     In late 2021, Congressman Kevin McCarthy had an in-person meeting with the Executive Producer for Bret Baier's show, who, upon information and belief, said to Congressman McCarthy that Ms. Bartiromo was "***not as credible as male anchors***" and that "***[McCarthy's] decision to appear on SMFMB was not a smart move politically.***"

133.     Ms. Bartiromo later voiced her concerns to Ms. Petterson about being undermined and "cut down" by certain male colleagues, as well as the unequal treatment she received from Fox News when she was "cut out" of a promotion that showcased two of her male anchor

colleagues – Mr. Baier and Mr. Wallace.  In that same conversation, Ms. Bartiromo complained to Ms. Petterson about the misogyny and bullying that both she and Ms. Grossberg had endured from Mr. Clark.

134.    In or about April 2021, Mr. Clark was replaced by Mr. Andrews as Senior Executive Producer of Fox News's weekend news, and the misogynistic baton was simply passed from one to the other.  Mr. Andrews continued to call and berate Ms. Grossberg for sharing information with Ms. Bartiromo, including the scheduling of a zoom call with herself and bookers for Jesse Watters's and Judge Jeanine Pirro's shows.

135.    In this conversation, Mr. Andrews stated that both Ms. Bartiromo and Ms. Pirro were "crazy," and he didn't want them joining the call.  No such disparaging remarks about or desire to exclude Mr. Watters (the male host) were ever expressed to Ms. Grossberg.

136.    On September 28, 2021, after receiving an email from Mr. Andrews that rudely and incorrectly blamed Ms. Grossberg for an error involving a guest, Ms. Bartiromo addressed the "elephant in the room" with Mr. Andrews himself over text: "Jerry we never hear from you unless you want to nitpick.  We never hear from you when we are #1 the whole weekend, not a word when we came back from the border on a Saturday & out awhile package together w fresh video & wet on air the next day for su[n]day But we hear fro[m] You when you want to yell at Abby for the branding of a guest?!"

137.    On January 25, 2022, Mr. Andrews called Ms. Grossberg and requested that she spy on and document Ms. Bartiromo's actions and report back to him so that "Lauren [Petterson] can get out in front of it."  In February 2022, Mr. Andrews reiterated his directive to Ms. Grossberg to "keep an eye" on Ms. Bartiromo and report back anything "crazy" that she said.

138.    The constant pressure on Ms. Grossberg from her male colleagues and supervisors to alienate her from Ms. Bartiromo took its toll.  On February 11, 2022, Ms. Bartiromo sent a text message to Ms. Grossberg stating: "would you like to tell me what is wrong & why you constantly disagree with me on everything lately. ... You keep disagreeing w me on everything & not answering me when you do not like ideas. if you do not want to work w me for some reason, you need to explain it to me... *It is ME who has been your biggest supporter i think for some reason you may have forgotten that*."

139.    Yet, even after Ms. Grossberg made the decision to move to TCT, Ms. Bartiromo and Ms. Grossberg parted on amicable terms.  On August 27, 2022, Ms. Bartiromo told Ms. Grossberg: "I tried hard to get them to make you an EP.  I resisted everyone they put in front of me.  *I wish you would know I wanted you to stay*." Ms. Grossberg responded, "Maria- as I begin a new chapter, I wish you tremendous success moving forward.  I am grateful for our time together and know that SMF will continue to soar!!" Ms. Bartiromo replied, "*Abby I love you so much.  I am here for you always.  I know you will continue to soar & crush it on [T]ucker.*"

**VI.    To Thrust Exposure for Its Wrongdoing Away from Fox Corporation and onto Others to Limit its Legal Culpability in the Dominion/Fox Lawsuit, Fox News, Through Its Lawyers, Coerces Ms. Grossberg to Shade Her Deposition Testimony to Her and Ms. Bartiromo's Detriment and in Favor of Certain Male Colleagues Deeply <u>Entrenched in the Dominion/Fox Lawsuit.</u>**

140.    Against this backdrop, in the Spring of 2022, Ms. Grossberg was told that she would be deposed in connection with the $1.6 billion Dominion/Fox Lawsuit.  In particular, the Dominion complaint alleges that Fox News had "intentionally provided a platform for guests that Fox's hosts *knew* would make false and defamatory statements of fact on the air." Complaint at ¶ 95, *U.S. Dominion, Inc. v. Fox News Network, LLC* (Del. Super., 2021) (CV N21C-03-257 EMD) (emphasis added).

34

141.    As to Ms. Bartiromo's role, the *Dominion* complaint alleges that: "[o]n November 7, 2020, Fox projected that President Trump had lost the 2020 U.S. Presidential Election.  By the next morning — November 8 — Fox began connecting Dominion with the false election fraud narrative.  Specifically, Fox and Maria Bartiromo invited Sidney Powell on the Sunday Morning Futures show.  Powell declared that there was 'a massive and coordinated effort to steal this election from We the People of the United States of America, to delegitimize and destroy votes for Donald Trump, to manufacture votes for Joe Biden.' [***] Bartiromo knew at the time these claims were false, or recklessly disregarded the truth.  Indeed, Bartiromo had previously reported in October that President Trump's lead would fade not because of fraud but because mail-in and absentee ballots would be counted later than in-person ballots." *Dominion* Complaint at ¶¶ 23-24.

142.    Over approximately the next four months, what ensued was a crash course in "what not to do" when it comes to legal ethics and employee rights.

143.    In March 2022, Fox News requested access to Ms. Grossberg's phones.  Ms. Grossberg fully complied by turning over her devices.

144.    In early June 2022, Lesley West, Senior Vice President, Legal & Business Affairs, contacted Ms. Grossberg and again requested access to her phones.

145.    Contemporaneously, Ms. Bartiromo called Ms. Grossberg to discuss the allegations in the Dominion/Fox Lawsuit and stated that she had hired her own attorney who had obtained everything that Ms. Grossberg had turned over to the Fox News Attorneys.

146.    Ms. Grossberg's deposition was originally scheduled to take place on August 12, 2022.  On August 10, 2022, Ms. Grossberg sat for her first day of deposition preparation with a team of Fox attorneys, including Steve Potenza, Fox News Deputy General Counsel, and Lesley

West, Senior Vice President, Legal & Business Affairs, as well as two outside attorneys, Paul Salvaty and Sean Suber, of Winston & Strawn LLP.

147.    Before they began, Ms. Grossberg questioned whether she needed to hire her own attorney and voiced concern that Ms. Bartiromo hired her own counsel.  Ms. Grossberg has never been deposed before, is not a lawyer, and was concerned about her own personal liability in the $1.6 billion lawsuit.  Without hesitation – *i.e.*, before anyone could explore the potential mine field of conflicts inherent in this situation – Mr. Salvaty responded to Ms. Grossberg with a definitive and discouraging "no," explaining that while some employees (referring specifically to Steve Doocy, a male on-air personality) may have retained a personal attorney, it only "complicates" the process and "slows things down." Ms. West later added that it was "distracting." It was clear to Ms. Grossberg that if she did not cooperate with them, she would only be further marginalized at the Network.

148.    Ms. Grossberg also asked the Fox News Attorneys whether she had exposure or whether she was in trouble, and the Fox News Attorneys told her not to worry.  She also asked the Fox News Attorneys if she should take notes.  They told her that she did not need to bother with taking notes – giving her the impression that they would share resources with her and that they would be representing her interests.

149.    Mr. Potenza and Ms. West oversaw the entire deposition preparation process.

150.    Wondering whether she was obligated to sit for a deposition, Ms. Grossberg asked the Fox News Attorneys whether all the other Fox employees, current and former, were cooperating.  The Fox News Attorneys responded, "[y]ou're one of the first ones, but we think everyone is going to cooperate."

36

151.    Ms. Grossberg felt coerced and intimidated into not saying anything that would make her become Dominion's "star" witness – a term coined by Ms. West during her deposition prep sessions.  In Ms. Grossberg's mind, this meant she needed to shade her testimony and not discuss other employees, not say anything that suggested she was a victim of gender discrimination and a hostile work environment, and, frankly, not say anything that made Fox News as a corporate entity look culpable.

152.    Ms. Grossberg got the impression, based on the demeanor and behavior of the Fox News Attorneys, including the scowls she received from Mr. Potenza and Ms. West and emphatic shaking of their heads "no," that she had to avoid questions about her relationship with colleagues such as Ms. Bartiromo and Mr. Clark even if it meant shading the truth to something equivocal and vague.   The Fox News Attorneys left her with the impression that she must answer questions "evasively" and be as "boring" as possible.

153.    Ms. Ms. Grossberg felt that she was being intimidated and coerced by the Fox News Attorneys and left with the impression she had to also downplay the importance of show ratings at Fox News, as this would suggest a motive for why Fox News had allowed the stories about Dominion to go on air in the first place.  In reality, Ms. Grossberg knew that Ms. Bartiromo was *"obsessed"* with ratings and immediately analyzed them upon their weekly release, demonstrating how important ratings were at Fox News.  However, Ms. Grossberg got the impression based on the conduct and behavior of the Fox News Attorneys that they wanted her to downplay this fact.

154.    Ms. Grossberg also left the deposition preparation sessions feeling pressured to respond with a generic "I do not recall," whenever she had the opportunity, even if she, in fact, did have a recollection, albeit perhaps not a perfect one.

155. In fact, none of the Fox News Attorneys ever explained to Ms. Grossberg that if she had any recollection relevant to the question being asked, she needed to say so. No attorney ever educated Ms. Grossberg about the distinction between "not knowing" and "not recalling." Indeed, several times during her deposition prep, one of the Fox News Attorneys would suggestively demur, "who really can recall anything after nearly two years?", thereby tricking Ms. Grossberg into doubting her own faculties.

156. Upon information and belief, by repeatedly quipping to Ms. Grossberg, "who really can/does recall anything?" during her deposition prep sessions, Fox News Attorneys were conditioning and fraudulently inducing her to deny facts she knew to exist, thereby exposing her to legal and reputational jeopardy.

157. Ms. Grossberg also left the deposition preparation sessions with the distinct impression and gnawing fear that she would suffer very negative professional consequences at Fox News if she did not "cooperate" and testify exactly as the Fox News Attorneys wanted.

158. Thus, Ms. Grossberg drew the troubled conclusion based on her deposition prep sessions with the Fox News Attorneys that it was in her interest (as well as that of Fox News) to minimize any troubling recollection she had that confirmed the allegations against Fox News in the Dominion/Fox Lawsuit – *i.e.*, that SMFMB was understaffed and that she and/or Ms. Bartiromo were overworked, stressed, and overwhelmed by the lack of adequate support and resources for their show. In reality, Fox News was well aware that both Ms. Bartiromo and Ms. Grossberg had complained repeatedly about receiving less support and resources than shows that were hosted by male anchors.

159. In fact, Fox News (and presumably its attorneys) knew that these male-anchored shows usually had five (or more) staffers compared to SMFMB's zero to one staffers.

160.     Nevertheless, the Fox News Attorneys intimated that Ms. Grossberg could not reveal how she was unable to read and react to all the email warnings that Dominion had sent to Fox News because she was simply stretched way too thin due to the lack of resources that Fox News afforded the all-female led SMFMB program.  Instead, Ms. Grossberg was intimidated by the Fox News Attorneys to indicate that nothing "fell through the cracks" at Fox News.

161.     In another telling sexist twist, Ms. Grossberg was coached to demean and diminish herself as someone who was not performing an important function at SMFMB although, in reality, she was virtually a production staff of one.

162.     During her deposition prep sessions, Ms. Grossberg was shown an email to review, dated September 26, 2020, that she had sent to Kevin Ward, a Researcher in Fox News's "brain room," in which she commiserated about having to "run lean" and being "slammed" with work on the show.  Ms. Grossberg left the deposition prep session feeling pressured and under the impression that she had to downplay those concerns or else would become Dominion's "star" witness.

163.     The truth was that the daily experience of being besieged as a professional woman in a hostile, male-dominated environment where she and Ms. Bartiromo were being constantly undermined and scapegoated[6] had taken a devastating toll on Ms. Grossberg's mental health, given the myriad experiences of unequal, sexist, and misogynistic treatment that were indelibly etched into her conscience.

164.     Tellingly, not one of the Fox News Attorneys advised Ms. Grossberg that by giving such misleading and evasive answers, she not only opened herself up to civil and criminal liability

---

[6] True to form, and as corroboration of Fox News's plan to scapegoat Ms. Bartiromo and Ms. Grossberg, Rupert Murdoch testified at his deposition in the Dominion/Fox Lawsuit that Ms. Bartiromo, but *not* Fox, "endorsed" the false notion of a stolen election, throwing Ms. Bartiromo directly under the proverbial bus.

for perjury, but placed all responsibility for the alleged defamation against Dominion on her shoulders, and by implication, those of her trusted female colleague, Ms. Bartiromo, and away from Fox News.

165.    Nor did any of the Fox News Attorneys explain to Ms. Grossberg how such a sworn statement could bring an end to her career as a journalist.

166.    Ms. Grossberg felt that Fox News was more concerned about protecting Mr. Clark and his chauvinistic behavior and constant belittling of her and Ms. Bartiromo.

167.    During these deposition prep sessions, Ms. Grossberg was shown two text exchanges from November 8, 2020, and November 9, 2020, to review, that made it clear that a particularly troubling segment in which Rudy Giuliani made unfounded allegations about widespread election fraud had been "pre-taped" and thus could have been edited or prevented from airing by Mr. Clark.  In order to cover up this omission, the Fox News Attorneys coached Ms. Grossberg to say that the segment was "live to tape" so as to imply that it could not have been edited in between taping and airing.  The Fox News Attorneys knew full well, however, that the implication they were trying to bully Ms. Grossberg to weave into her testimony was materially misleading.  Ms. Grossberg felt frightened and confused as the Fox News Attorneys tried to gaslight her.

168.    The Fox News Attorneys then presented Ms. Grossberg with a text message exchange, dated November 29, 2021, between Ms. Grossberg and Ms. Bartiromo to review in which Ms. Grossberg called Mr. Clark a "smug piece of shit" because *__he had insultingly referred to their interview with Donald Trump (the first interview since he had lost the election) as "filler."__*

169.    Ms. Grossberg got the impression that the Fox News Attorneys did not want her to go into detail about this during her testimony.  Ms. Grossberg also got the distinct impression that, since she would soon be joining "Tucker's team," she had to "cooperate" with the Company.

170.    Already fearful that the role of Executive Producer was almost unattainable for a woman like her at Fox News, Ms. Grossberg convinced herself that discretion would be the better part of valor in this instance, and decided she would follow the directions of the attorneys who claimed they represented her best interests in connection with her deposition and often kept her truth – the truth that the Fox News Attorneys did not want to hear – to herself.

171.    Ultimately, after the end of the second day of deposition preparation, Ms. West emailed Ms. Grossberg at 9:20pm on August 11, 2022, informing her: "Apologies for the late email, but the deposition will not proceed tomorrow.  We will be in touch about rescheduling."

172.    Ms. Grossberg was never consulted regarding the last-minute re-scheduling of her deposition.  Moreover, the Fox News Attorneys used her as a convenient scapegoat to accomplish their deleterious objective without ever warning her that this would subject her to intense and uncomfortable examination during her deposition that would damage her credibility and reputation, inflict significant emotional distress upon her, and expose her to substantial legal jeopardy.

173.    On August 16, 2022, Ms. Grossberg was called back to meet with the Fox News Attorneys, who intimidated her into surrendering access to her personal email, social media accounts and other communication apps.  Although previously being assured by the Fox News Attorneys that she would not need her own attorney, and that they were there to represent her interests as a witness, now, to shake Ms. Grossberg down, the demeanor of the Fox News Attorneys had changed.  In fact, the Fox News Attorneys threatened her that if they found out that she was

"hiding" anything, or refused to cooperate with Fox News's defense strategy, she would have to hire her own attorney.  In this context, the Fox News Attorneys made it clear that the Network would not look favorably on her if she hired her own legal representation.  This only reinforced Ms. Grossberg's understanding that, unless and until told otherwise, the Fox News Attorneys were representing her own interests jointly with those of Fox News.

174.    On September 13, 2022, Ms. Grossberg had another full day of deposition preparation, during which she was grilled by the Fox News attorneys on all her prior packaged answers.

175.    Ms. Grossberg got the impression, based on the collective behavior of the Fox News Attorneys (*i.e.*, their stern or suggestive tone, their direct looks, their audible "tsks," and their loud "no's") during this prep session, that she needed to deny knowledge about why her deposition had been delayed.

176.    It was also clear to Ms. Grossberg, however, based on the impression she was given by the Fox News Attorneys, that they were displeased with the forthcoming and candid answers she had provided during her prior two prep sessions, and that the Fox News Attorneys needed more time with her to make sure she got her story straight and in line with the Company's position.

177.    Ms. Grossberg felt sick to her stomach with fear, uncertainty, and confusion when she realized what her employer wanted her to do under oath, *i.e.*, shade, bend, or deflect the truth whenever necessary to make Fox News look good – or else she would not be working there much longer.

178.    All in all, Ms. Grossberg felt incredibly alone and powerless because she dared not say anything that would jeopardize her new role on *Tucker Carlson Tonight*.

179.    Ms. Grossberg was made to believe that she had to agree to be deposed and accept the advice of the Fox Attorneys to be deemed a "team player."

**VII.    Ms. Grossberg's Deposition in the Dominion/Fox Lawsuit.**

180.    On September 14, 2022, Ms. Grossberg sat for her deposition, and was examined by Dominion's attorney, Davida Brook, of Susman Godfrey LLP.

181.    Ms. Grossberg was asked many of the questions presented to her in the preparation session, including most importantly, the reason for her transition to TCT, how she felt about David Clark, and her relationship with Ms. Bartiromo.

182.    Ms. Grossberg was presented with a text message exchange from Mr. Carlson to an unknown person and was asked to read it aloud.  The exchange contained statements from Mr. Carlson such as "Sidney Powell is lying. Fucking bitch[,]" and repeatedly referred to Ms. Powell as a "cunt." Ms. Grossberg was then asked whether what she just read made her feel "uncomfortable," to which Ms. Grossberg felt compelled to respond, "no," or else face consequences based on the behavior of the Fox News Attorneys during her deposition prep sessions.

183.    Ms. Grossberg was then asked how she would feel if that type of language was used by Mr. Carlson around her or directed towards her by Mr. Carlson, and she responded – as she had been conditioned by Fox News Attorney – that she had just started working with him and had not witnessed him use such language and she declined to speculate about how she would react.

184.    In truth, Ms. Grossberg knew full well, largely based on public information, that Mr. Carlson was very capable of using such disgusting language about women in the workplace. She also knew how terribly she had felt every time she had heard her prior male superiors and colleagues at Fox News spew misogynistic phrases at her (or within her earshot) on a constant

basis. Ms. Grossberg also knew, however, and was conditioned to constantly remember that she could not do anything to jeopardize her new position, such as becoming Dominion's "star witness," so she again kept quiet.

185.    The day after her deposition, on September 14, 2022, Mr. McCaskill asked Ms. Grossberg about what she covered in her testimony. Ms. Grossberg revealed that Mr. Carlson's name had come up, but that she protected him. Mr. McCaskill said he was happy with the answers she had given and suggested they order the staff lunch to celebrate her defense of Mr. Carlson's misogynistic-laden texts that were shown to her. Later that day, an email was sent to the whole TCT team in recognition of "Abby Day."

## VIII.    The Fox News Attorneys Inexplicably Refuse to Provide Ms. Grossberg the Opportunity to Review and Correct (if Necessary) Deposition Testimony Bordering on Malpractice, Even Though Male Employees Were Given This Exact Opportunity.

186.    As Ms. Grossberg continued performing her job duties as Head of Booking at *Tucker Carlson Tonight*, she became aware that ***her male colleagues, including Senior Executive Producer Justin Wells, had been provided copies of their deposition transcript to print, review and correct, while other males, such as Eldad Yaron, were provided large binders comprised of relevant exhibits to review at home before his deposition.*** Ms. Grossberg waited for months to be contacted by any of the Fox News Attorneys regarding her opportunity to review her transcript, but heard nothing from them, nor ***was she provided the opportunity to even read, much less correct and sign, the transcript of her deposition.***

187.    After reading reports that the Dominion/Fox Lawsuit had been scheduled for trial, on January 25, 2023, Ms. Grossberg emailed Mr. Salvaty and Mr. Suber requesting a copy of her deposition transcript and expressing her concern that – upon reflection – she was uncertain that

her testimony was fully accurate because of the intimidating, coercive, and confusing "coaching" she had received.

188.     Ms. Grossberg explained to Mr. Salvaty and Mr. Suber – the two outside attorneys who were supposed to be representing her interests as a witness during the deposition –  that her "rights and obligations as a witness had not been adequately explained to her," and that she believed the Fox News Attorneys were required to provide her a copy of her transcript to review, correct (as necessary), and sign, per Delaware Civil Procedure Rule 30.

189.     The Fox News Attorneys acknowledged that they had her deposition transcript but refused to tell her when she would receive it to review and correct, if necessary, nor assure her that she would have the full allotment of time to review and correct to which she was entitled.

190.     On January 25, 2023, Mr. Suber responded saying that he would "work with the team and talk to Lesley [West] to make sure we get you a copy of your deposition as soon as possible."

191.     On January 26, 2023, Ms. Grossberg responded to Mr. Suber and Mr. Salvaty: "I look forward to reviewing my deposition testimony in order to correctly assess any edits you made and any edits I may have [to make] as well.  Can you give me a timeframe of when I should expect to receive the transcript?" Mr. Suber replied that same day: "***Should be soon.  We sent it to Fox's in-house lawyers this morning, so just waiting for them to tell us we can send to you***."

192.     On February 1, 2023, after almost a week of not hearing anything from Mr. Suber, Ms. Grossberg emailed him again: "I'm just following up on my request to view a copy of the deposition transcript that I gave in the Dominion case.  You mentioned last Thursday that I would receive it soon, so just wanted to check in to see if you had an update?  I ask because I know many colleagues were already provided copies to review after their deposition, and I'm concerned that I

haven't yet seen mine." Mr. Suber replied that he was, "[e]mailing the internal Fox team now to follow up.  I apologize about the delay."

193.    On February 2, 2023, Mr. Suber wrote to Ms. Grossberg: "Still no word from the internal Fox team in response to my email.  We have a call with them today, so I will make sure I raise it on the call.  I will circle back this afternoon but did not want you to think I was ignoring you or the situation."

194.    The following week, on February 6, 2023, Ms. Grossberg wrote to Mr. Suber: "Can you please let me know who at Fox is holding up sending me my transcript?  As I mentioned, I know of other Fox employees who were sent a copy of their transcript shortly after providing their statement and have read through everything."

195.    In total Ms. Grossberg, either directly or through her attorneys, had to request her deposition transcript from the Fox News Attorneys at least six times before she received a copy.

196.    Ms. Grossberg was never instructed properly about her rights and obligations as a sworn witness.  Unlike numerous of her male colleagues, Ms. Grossberg was never provided her deposition transcript to review before it was made public in the Dominion/Fox Lawsuit.  She was only given a copy after her attorneys contacted Dominion's attorneys and notified them that the Fox News Attorneys were refusing to provide Ms. Grossberg a copy.

197.    While Ms. Grossberg finally received a copy of the deposition transcript on March 3, 2023, she was not advised until March 15, 2023, about a stipulated deadline for submission of errata sheets of March 20, 2023, denying her the 30 days to review to which she was entitled under Delaware Civil Procedure Rule 30.

198.    The magnitude of the changes that Ms. Grossberg made in her errata sheet ultimately reflected the degree to which she felt intimidated and coerced by the Fox News

Attorneys to answer the questions in a way that would not cause Fox News to retaliate against her in the terms and conditions of her employment compared to male employees, but which ultimately caused detrimental, irreparable harm to her professional reputation.

**IX.   The Fox News Attorneys Knowingly Permit the Publication of Certain Defamatory Statements Included in an Excerpted Version of Ms. Grossberg's Testimony Filed <u>With the Court and Made Available to the Press and General Population.</u>**

199.   On January 17, 2023, Dominion filed a motion for summary judgment with the Superior Court of Delaware that cited to, among other things, various portions of Ms. Grossberg's deposition testimony, which Ms. Grossberg was never given the opportunity to review and correct. Ms. Grossberg was mentioned at least 15 times and her deposition transcript was referred to at least 11 times.

200.   On February 16, 2023, a Public Version of Dominion's Brief in Support of its Motion for Summary Judgment was published and made readily available to the world.  *See* Motion for Summary Judgment at 117-121, *U.S. Dominion, Inc. v. Fox News Network, LLC* (Del. Super., 2021) (CV N21C-03-257 EMD).

201.   Dominion directly cited Ms. Grossberg's deposition transcript for the following proposition: "Fox knew the charges were false yet failed to provide viewers with any of the extensive evidence disproving them. […] This fits with the testimony of Bartiromo's producer, Abby Grossberg: 'Q: If someone says something untrue on one of your shows, do you think it's important to correct it? A: No.'" *Id*. at 170 (citing to Ex. 121, Grossberg 243:11-14).

202.   Ms. Grossberg attests that she would have answered differently had she not been conditioned and intimidated by the Fox News Attorneys.  Specifically, Ms. Grossberg would have elaborated upon and explained that guests have the right to free speech (within reason), that SMFMB was an interview program, that Ms. Bartiromo asked questions aimed at getting to the

bottom of significant issues and stories, and that it was in fact Ms. Bartiromo's responsibility to scrutinize what a guest says with facts or follow-up questions.

203. After Dominion's Brief in Support of its Motion for Summary Judgment was published, various news outlets, including NPR News, The Atlantic, and Raw News, reported on its contents.

204. Based on the statements quoted in the motion for summary judgment attributed to Ms. Grossberg, writers at prominent media outlets called, *and continue to call,* into question Ms. Grossberg's ethics as a journalist and her professional judgment.

205. As a result, Ms. Grossberg began to experience severe anxiety and stress due to the unsealing of her uncorrected transcript as well as wide publication of these hurtful and defamatory statements.

206. The following day, February 17, 2023, Ms. Grossberg's counsel wrote to Fox News and its outside lawyers at Winston & Strawn LLP requesting the immediate production of Ms. Grossberg's deposition transcript so that she had an opportunity to review and correct it. Inexplicably, Ms. Grossberg was still not provided with her deposition transcript for several more weeks until March 3, 2023, despite having a copy of the transcript in hand since at least January 26, 2023.

207. Indeed, on March 7, 2023, a Public Version of Redacted Exhibits in Support for Dominion's Motion for Summary Judgment Portions was published and made readily available to the world, including an excerpt of Ms. Grossberg's deposition transcript. *See* Exhibits 119-121 to the Affidavit of Katherine Peaselee, *U.S. Dominion, Inc. v. Fox News Network, LLC*, No. CV N21C-03-257 EMD (Del. Super., 2021) and *U.S. Dominion, Inc. v. Fox Corporation*, No. C.A. No. N21C-11-082 EMD (Del. Super., 2021).

208.    As such, additional statements of Ms. Grossberg's uncorrected deposition transcript were published to the world, including the following answers that comport with the Fox News Attorneys' coaching of Ms. Grossberg and their warnings to not name additional male senior executives:

> Q. And Mr. Clark had the authority to give you guidance about what content could be on Sunday Morning Futures, correct?  A. Correct.
> Q. And Mr. Clark had the authority to give you guidance as to which guests could be on Sunday Morning Futures, correct?  A. Yes.
> Q. And surely there are other individuals above you who could tell you not to have certain content on your program, correct?  A. I only dealt with David Clark, who I know would run it up the chain.  But to who, I don't know.

Ex. 121, Grossberg 256:13-25; 257: 3-5.

209.    Other statements released from her excerpted transcript include the following, "Q. Do you believe you have an obligation to independently investigate claims made by guests on your show before you bring them on?  No, I don't." Ex. 121, Grossberg 67:9-1.

210.    Based on the statements quoted in the redacted exhibits attributed to Ms. Grossberg, writers at prominent media outlets, including the *Los Angeles Times*, once again called into question Ms. Grossberg's ethics as a journalist and her professional judgment.

211.    The resulting testimony proffered by Ms. Grossberg as a direct and proximate result of Defendants' wrongdoing is shaded and incomplete, leaving her vulnerable to repeated reputational harm.

**X.    Fox News's Legal Team Intentionally and Maliciously Continues to Perpetrate the Fraud that Ms. Grossberg's Testimony was Freely Given, Accurate, and Legally Complete; Therefore, No Errata Should be Allowed.**

212.    The foregoing actions, conduct, events, facts, and circumstances render it abundantly clear that, for nefarious purposes, the Fox News Attorneys pretended to be (but certainly did not act as) Ms. Grossberg's attorneys during her deposition preparation and

testimony. As a result, Ms. Grossberg may: (a) waive her jointly held attorney-client privilege and submit whatever evidence she wishes of the Fox News Attorneys' wrongdoing; and (b) pierce the shattered shield of the exclusive attorney-client privilege Fox News wishes to erroneously assert notwithstanding the operative crime, fraud, and misconduct exception that is well-established under the law.

213.    Remarkably, upon information and belief, on March 23, 2023, the Fox News Attorneys made a bad faith proffer in open court that Ms. Grossberg is a witness under their control whom they may offer to testify, notwithstanding the following known facts: (a) Ms. Grossberg is not a citizen of Delaware; (b) Ms. Grossberg had been put both on forced administrative leave and under a threat of termination by Fox News just days prior; and (c) Ms. Grossberg had proclaimed her unwillingness to continue to countenance the lies that Fox News was attempting to cram into her mouth.

214.    The foregoing actions, conduct, facts and circumstances, along with Ms. Grossberg's firing on March 24, 2023, make it perfectly clear that: (a) she cannot be compelled to testify at the trial in the Dominion/Fox Lawsuit; (b) she will never testify on behalf of Fox News in the trial; and (c) she will only voluntarily testify – if at all – on behalf of Dominion.

**XI.    After Ms. Grossberg Leaves to Work at *Tucker Carlson Tonight*, She is Replaced on SMFMB by a Less Qualified Male Employee Who is Bestowed the Coveted Executive Producer Title Ms. Grossberg Had Unlawfully Been Denied Because of Her Gender.**

215.    On June 21, 2022, Ms. Grossberg applied for an opening to be the Head of Booking and a Senior Producer at *Tucker Carlson Tonight.*

216.    On July 13, 2022, Ms. Grossberg interviewed with Charlie Couger, the Executive Producer of *Tucker Carlson Originals*, who insultingly asked her whether she was "good at finding restaurants for the staff to eat and order food from." Mr. Couger stated that the current Head

Booker, Kelly McNally, whose role she was interviewing for, was the "office mom," and that this was part of the job.

217.    On July 19, 2022, after another round of interviews, Ms. Grossberg was hired by Justin Wells, Senior Executive Producer and Vice President of Tucker Carlson Digital Products.

218.    Mr. Wells informed Ms. Grossberg that her salary would be $145,000, which Ms. Grossberg replied was significantly less than the typical salary for Senior Producers of primetime shows - a minimum of $175,000 – and that candidates with her experience were more likely to garner $200,000.  Specifically, Ms. Grossberg asked Mr. Wells if the salary was competitive with her male counterparts on the TCT team. ***Mr. Wells admitted that the offer was indeed lower than comparable males' salaries in the role*** and tried to appease Ms. Grossberg by promising that they would revisit her salary in six months.  They never did.

219.    On July 20, 2022, Ms. Grossberg informed Mr. Andrews that she would be accepting the new position due, in part, to the stress of working on SMFMB without adequate assistance or recognition for her contributions.

220.    Mr. Andrews then informed Ms. Grossberg that he would match the salary offered by the *Tucker Carlson Tonight* team to induce her to stay with SMFMB.  Ms. Grossberg declined, reiterating that she believed it was unhealthy for her to continue working on the show, especially given the refusal of higher-ups to give her the Executive Producer title she had deserved.

221.    Shortly before Ms. Grossberg officially left SMFMB, on August 27, 2022, Ms. Bartiromo wrote to Ms. Grossberg: "I am trying too hard to work without you on this show but something happened that you are not telling me.  None of this is my fault. I tried hard to get them to make you an EP.  I resisted everyone they put in front of me.  I wish you would know I wanted you to stay."

222.    Tellingly, Fox News had to ultimately hire *two* people to replace Ms. Grossberg, including **Christopher Faulkner, a floating line producer about whom Ms. Bartiromo previously expressed significant displeasure and concern, based party on certain incidents involving plagiarism, who was immediately given the Executive Producer title.**

223.    Additionally, the Company hired a full-time booker named Emily Tubb to assist Mr. Faulkner.

224.    Since Ms. Grossberg's departure from SFMMB, ratings have declined from an average of 1.8-1.9 million viewers under her guidance, to 1.46 million viewers as of the mid-February 2023 ratings report.

## XII.    Ms. Grossberg Continues to Suffer a Hostile Work Environment and Overt Discrimination Based on Her Sex Immediately After Joining *Tucker Carlson Tonight.*

225.    On September 5, 2022, Ms. Grossberg officially began her new role on *Tucker Carlson Tonight*.

226.    As Head of Booking, Ms. Grossberg led the team responsible for guest bookings and used her extensive industry contacts to communicate with, pitch, and secure high-profile guests at the center of major news stories.

227.    Ms. Grossberg quickly learned, however, that she had merely traded in one overtly misogynistic work environment for an even crueler one – this time, one where unprofessionalism reigned supreme, and the staff's distaste and disdain for women infiltrated almost every workday decision.

228.    In or about August 23, 2022, while Ms. Grossberg was still transitioning from her role on Ms. Bartiromo's show, Benno Kass, a researcher on TCT, wrote to Ms. Grossberg about an interview Mr. Carlson wanted to do with Andrew Tate — the self-proclaimed "misogynist" who has described women as "intrinsically lazy," stated there was "no such thing as an independent

female," compared women to property, and graphically described how he would assault a woman for accusing him of cheating.

229.   Ms. Grossberg cautioned Mr. Kass about the sensitivity of the interview, including the potential blowback from women's groups, and suggested TCT at least bring in a female guest to balance the segment.

230.   Mr. McCaskill and Mr. Fox ignored Ms. Grossberg's suggestions and seemed annoyed that she was expressing her opinion about how the Network should be cautious about airing programming that may offend women.

231.   Instead, Mr. McCaskill and Mr. Fox chose to make fun of the young women whom Mr. Tate is alleged to have held captive in Romania.  Mr. McCaskill, who happened to be planning a personal trip to Romania, discussed wanting to visit Mr. Tate's compound and "hang out with him."

232.   Later, in December 2022, Mr. Tate was charged with human trafficking and rape by Romanian authorities.

233.   On September 5, 2022, Ms. Grossberg's first full day on the *TCT* team, she was shocked to be greeted by many large and blown-up photographs of ***Nancy Pelosi in a plunging bathing suit revealing her cleavage***.  The images were plastered onto her computer and elsewhere throughout the office.  Apparently, the "joke" was that Speaker Pelosi looked terrible in a bathing suit.

234.   Ms. Grossberg was mortified by what she was witnessing and began to experience a sinking feeling in her stomach as it became apparent how pervasive the misogyny and drive to embarrass and objectify women was among the male staff at TCT.

235.     The next day, Mr. Wells called Ms. Grossberg into his office, where Mr. McCaskill was present, and asked her an uncomfortable sexual question about her former boss: "*Is Maria Bartiromo fucking Kevin McCarthy?*" Shocked, Ms. Grossberg replied "No," and quickly left the room.

236.     The following day, September 7, 2022, Gregory Re, TCT Investigative Producer and Writer, sent Ms. Grossberg a series of harassing and unprofessional late-night emails regarding a decision Ms. Grossberg had made (with Mr. McCaskill's backing) to have a potential guest meet with Mr. Carlson virtually rather than in person.

237.     Mr. Re threateningly warned Ms. Grossberg as follows: "*don't subvert Tucker going forward.  Don't deal with me either[.]*"

238.     On or about September 8, 2022, Ms. Grossberg alerted Mr. Wells and Mr. McCaskill to Mr. Re's inappropriate and harassing conduct.  In response, the two brushed aside her concerns while admitting that Mr. Re had harassed other staffers in the past but was hard to replace, so they "lived with it."

239.     Moreover, the staff at *Tucker Carlson Tonight* frequently engaged in group discussions, led by Mr. McCaskill, in which misogynistic views of women as objects to be judged solely based on their appearance were broadcasted.  Such discussions were commonplace, often involving Andrew Carmichael, Editorial Producer, Eduardo Neret, Associate Producer, and Benno Kass, Researcher, and were always within earshot of the female members of the staff.

240.     In these discussions, no woman, whether she was a Republican politician or a female staffer at Fox News, was safe from suddenly becoming the target of sexist, demeaning comments, such as being called a "cunt."

241.    On one occasion, on or about October 17, 2022, Michigan gubernatorial candidate Tudor Dixon was scheduled to appear as a guest on TCT to discuss her campaign.  Before her arrival, a crass and sexist discussion in the newsroom ensued regarding *whether Ms. Dixon or her opponent, Governor Gretchen Whitmer, was "hotter and more fuckable."*

242.    This "debate" was moderated by Mr. Carmichael, who made several sexist remarks about the two woman's appearance, and even polled the office on their views.

243.    The same offensive discussion resurfaced when Ms. Dixon joined the show again weeks later.

244.    In another example of overt sexism in Ms. Grossberg's workplace, in or about January 1, 2023, while Republican Congresswoman Kathryn Cammack appeared on TV as she spoke on the House Floor, Mr. McCaskill mocked her weight and appearance by stating she was *"fat like Kelly Clarkson,"* to which another male employee added that *"she only became a Congresswoman because she fucked the person who had the job before her."* Such disgusting remarks were never made about men appearing on TCT.

245.    During yet another offensive discussion on or about December 12, 2022, at TCT, Mr. Kass and Mr. Neret declared that women with tattoos, nose piercings, or rainbow-colored hair were "disgusting," should be shunned, and mused that such personal appearance choices reflected on their "character." Mr. McCaskill agreed.

246.    Ironically, Mr. McCaskill himself has tattoos, and most tellingly, did not speak spoke degradingly of men with body art.

247.    Ms. Grossberg interjected to her male colleagues that they should still respect these women, even if they did not find them attractive.  Ms. Grossberg added that she herself had three small tattoos, so she found the comments particularly offensive.

248.   To add insult to injury, Mr. McCaskill invasively asked Ms. Grossberg where her tattoos were, and Mr. Carmichael stated he thought it was illegal for "Jews" to have tattoos.

249.   Mr. McCaskill habitually belittled female employees of Fox News as juxtaposed to their male counterparts in the office.  For example, *while discussing a promotional idea for Mr. Carlson's "End of Men" documentary, Mr. McCaskill remarked that the "mother's room" — a private office designated for Fox News employees to pump breast milk — was a "waste of space" and should be replaced with a "room of tanning beds for the guys to tan their testicles," a practice Mr. Carlson recommended to viewers to boost testosterone.*

250.   Mr. Wells and Mr. McCaskill often remarked that Lexi Ciccone, a TCT Booker who reported to Ms. Grossberg, should use her sex appeal to the TCT team's advantage, such as by "sleep[ing] with Elon Musk to get [an] interview" and that she could be his "next wife."  Ms. Ciccone herself, likely feeling as if she needed to "fit in" and add commentary matching her misogynist work environment, would respond that men "masturbated" to her.

251.   Mr. McCaskill also mocked the appearance of Kailey Grill, a Production Assistant, saying she looked "really rough," to which Mr. Wells replied, "maybe it was because a guy dumped her and if so, who cares?"

252.   Ms. Grossberg reminded the men that Ms. Grill had just been out sick with the flu.

253.   Not surprisingly, on October 26, 2022, less than a month and a half after starting at TCT, Ms. Grossberg felt so anxious, depressed, and physically weak from the barrage of sexist, chauvinistic, and sexualized comments to which she was being subjected in the office that she called in sick at the behest of her therapist.

254.   By this point, the toxic work dynamic had impacted her health severely, such that she could barely eat and lost nearly 10 pounds in less than two weeks.

255.    Yet, while she was home sick, a junior male staffer named Tom Read sent Ms. Grossberg an aggressive email because she had used her editorial discretion to shorten his pitch for a story because it was too cumbersome for Mr. Carlson to review.

256.    Mr. Read's entitled and sexist tone only compounded Ms. Grossberg's anxiety.  Even when she later reported this exchange to Mr. McCaskill and Mr. Fox and suggested that the team come up with a standard pitch template for the staff to use, Mr. McCaskill refused to adjust the process and ignored her suggestions and concerns about Mr. Read's troubling behavior.

**XIII.    Ms. Grossberg Continues to Endure a Hostile Work Environment Based on Her Sex and is Further Belittled and Demeaned After Mr. McCaskill Becomes Her Supervisor.**

257.    On or about November 21, 2022, Mr. Wells took a leave of absence and informed Ms. Grossberg that Mr. McCaskill would serve as her direct supervisor while he was away from work.

258.    Mr. Wells assured Ms. Grossberg that she was still in charge of the booking team, that she was "doing a good job," and that "nothing would change," except that Mr. McCaskill would need to approve administrative matters such as business expenses and vacation requests.

259.    However, on November 30, 2022, Ms. Grossberg was unknowingly demoted and removed of her Senior Producer title to enable Mr. McCaskill, also a Senior Producer, to act as Ms. Grossberg's direct manager.

260.    Ms. Grossberg was never directly informed of this clearly discriminatory change but learned of it through Fox News's WorkSpace hierarchy.

261.    Mr. McCaskill immediately began to marginalize Ms. Grossberg's role as Head Booker to position himself as the new leader of the booking team.

262.    Upon information and belief, Mr. McCaskill and Mr. Wells conspired to demote Ms. Grossberg *de facto* and surreptitiously.

263.    Upon information and belief, Mr. McCaskill and Mr. Wells each engaged in this conspiracy with both discriminatory and retaliatory animus based on Ms. Grossberg's sex.

264.    On December 1, 2022, Mr. McCaskill created a text message group with Ms. Grossberg, Ms. Ciccone, Eldad Yaron, Booking Producer, and Samantha Ottimo, Booker, in which Mr. McCaskill began directing the booking team himself.

265.    The next day, Mr. McCaskill added Mr. Fox to the text message group, who also followed suit, and started directing Ms. Grossberg's team.

266.    From that point forward, communications involving the TCT booking team became confusing and haphazard.

267.    Previously, potential news stories were discussed on a Senior Producer level, and any relevant tasks or assignments were then delegated by Ms. Grossberg to her team directly.

268.    Moreover, the new text message group also became another forum within which Mr. McCaskill could harass, undermine, and embarrass Ms. Grossberg in front of her team.

269.    On December 8, 2022, Ms. Grossberg asked the group to limit the information circulated to important matters out of concern that the group would accidentally miss something important.  Regrettably, this request was not heeded, and when Ms. Grossberg dared to ask Mr. McCaskill a follow-up question aimed at reducing the confusion, she was ridiculed and spoken down to in plain view of her entire team.

270.    Even though Ms. Grossberg was excelling at her job, and was even able to secure Congressman George Santos as a guest on the show, Mr. McCaskill baselessly accused her of

creating "chaos" and dismissively told Ms. Grossberg to "hand off the guest" and "[p]ut in the Q. [a]nd go on vacation … We have it from here."

271.    Mr. McCaskill's constant bullying and gaslighting, including his baseless claim that he was "hearing" that things were "unorganized" on her team, caused Ms. Grossberg so much stress and anxiety that her stomach ulcers flared up and she was in excruciating pain and had to miss the TCT holiday party on December 20, 2022.

272.    On December 21, 2022, in yet another despicable display of how appallingly male TCT staffers view and speak to women, rumors began to circulate about how Mr. Read had approached actress Natasha Lyonne at a bar and told her that her "show sucks."

273.    Mr. Read then boasted without solicitation that he would have been able to sleep with Ms. Lyonne right in front of a female TCT employee named Toni Peake, who became visibly upset by his sexist and unwanted commentary.

274.    Ms. Peake later confided in Ms. Grossberg that she too suffered severe anxiety, had a massive panic attack, and was "terrified" to report to work, ostensibly due to the way women were treated by male staff.

275.    Ms. Grossberg also was frequently shut out of important meetings and was unnecessarily questioned about her editorial judgment.  For instance, on January 2, 2023, Ms. Grossberg mused whether the team was planning to cover Rep. Kevin McCarthy's bid for Speaker of the House.  Mr. Fox responded that Mr. Carlson would not be "into it."

276.    Three days later, Mr. Fox changed course, stating that Mr. Carlson wanted to cover Rep. McCarthy's bid for the Speakership, and Ms. Grossberg began reaching out to her contacts to book him as a guest on TCT.  Ms. Grossberg wrote to her team, including Mr. McCaskill: "Just

spoke to his comms director who I know very well.  They're interested and it sounds positive.  The schedule is obviously fluid, so we will touch base again around 1p after the next round."

277.    Ms. Grossberg then wrote to Mr. Carlson: "My friend who will try to convince McCarthy said he may be scared we'll nuke him over Luntz.  Is he that weak? Pushing for him to call you.  Lmk if he does." Mr. Carlson responded, "Please tell them that I promise I won't mention Franks Luntz.  I've done that repeatedly.  I don't need to do it again.  This interview isn't about that.  No one else has stepped forward to challenge McCarthy.  He's still the only option.  I keep hearing from people who know him that this process has improved him.  I want to give him a chance to make the case that it has.  Feel free to screenshot this text for his office.  Thanks."

278.    Ms. Grossberg did just that, but later informed Mr. Carlson that Rep. McCarthy is "[…] afraid, which is ridiculous.  If he can't face you, how is he going to fight Biden and the Dems?  After 7 losses it can only help him." Mr. Carlson replied, "He'd be a cowardly idiot not to.  Which he may be." Mr. Carlson added: "I really hope he does it.  I'll be a little mean, because that's who I am.  But I won't be too mean.  I want to help fix this.  Please send a screenshot of this text if it helps."

279.    At approximately 2:30 pm that day, Mr. McCaskill instructed Mr. Yaron to book Rep. Matt Gaetz as a guest on TCT, without having any regard for Ms. Grossberg's efforts to fulfilling Mr. Carlson's request to book Rep. McCarthy.  Ms. Grossberg warned Mr. McCaskill that booking Rep. Gaetz could jeopardize the Rep, McCarthy booking and undermine her efforts on behalf of Mr. Carlson.

280.    Mr. McCaskill proceeded to berate and scream at Ms. Grossberg in front of the whole team about how she "didn't care about telling both sides of the story" and was "bias[ed]" in

favor of Rep. McCarthy.  Mr. McCaskill then excluded Ms. Grossberg from a meeting with Mr. Wells and Mr. Fox.

281.    When Mr. Wells emerged from that meeting, he spitefully belittled Ms. Grossberg by asserting that *he* had been working on connecting Mr. Carlson with Rep. McCarthy for two days, and that her efforts were merely "confirming the work he had already put in."

282.    Mr. Wells also claimed that Mr. Carlson had been "talking on the phone with McCarthy for days," which was obviously untrue and meant just to gaslight Ms. Grossberg further.

283.    However, Rep. McCarthy's team later confirmed that Ms. Grossberg was the only one from TCT they had spoken to about Rep. McCarthy's appearance on the show.

**XIV.    Ms. Grossberg is Harassed Based on Her Jewish Faith by Mr. McCaskill.**

284.    In or about October 31, 2022, Mr. McCaskill put his discriminatory animus against Ms. Grossberg based on her Jewish religion on display.  Mr. McCaskill installed three large, inflatable Christmas decorations inside the TCT booking team's seating area – a preposterous display that was distracting and loud – as well as one full-sized and one smaller Christmas tree.

285.    However, anytime Ms. Grossberg tried to turn off the distracting and loud inflatable decorations, Mr. McCaskill would contemptuously demand that the Christmas decoration be turned back on and call her a "Scrooge" or "Grinch."

286.    Upon information and belief, Mr. McCaskill also hung up a sign on the smaller Christmas tree which had been placed next to Ms. Grossberg's desk that read, "Hanukkah Bush."

287.    In or about December 2022, as the team discussed the upcoming Fox News Spotlight Awards which recognized employees for their outstanding performance and contributions, Mr. McCaskill quipped that the entirely Caucasian TCT team could never win the

$10,000 prize for "Inclusion Ambassador of the Year," which recognizes employees who "lead by example in celebrating, engaging, and advocating on behalf of diverse community voices."

288.   Mr. McCaskill then offensively suggested that they nominate Eldad Yaron, a Booking Producer for TCT, for the award solely because he was an "Israeli Jew," and could use the $10,000 to buy the team pizza for a year.

289.   Mr. Yaron awkwardly shrugged off the idea, assuming Mr. McCaskill was not being serious.  However, Mr. McCaskill later approached Mr. Yaron and repeated his idea.

290.   Mr. Yaron and Ms. Grossberg, who was within earshot, both grew increasingly uncomfortable with this discussion, especially given how months earlier, Mr. McCaskill ridiculed Mr. Yaron to other employees when he out of the office for taking time off to celebrate both Rosh Hashanah and Yom Kippur because they fell on back-to-back weeks.

291.   As the year came to an end, Ms. Grossberg bought each of her team members a gift to thank them for their diligent work.  In turn, Mr. Yaron bought a babka (a historically Jewish sweet bread) for the office.  When Mr. McCaskill learned that there was babka in the office, he began to loudly and obnoxiously demand that the TCT booking team have "the bread made by the Jews." Thereafter, anytime Mr. Yaron purchased his lunch from the Jewish bakery known as Breads Bakery, Mr. McCaskill loudly proclaimed to the TCT booking team that Mr. Yaron went to the "Jew bakery," and that he had gone "to see his people."

292.   This incredibly demeaning and offensive conduct was made even worse by the fact that Mr. McCaskill endorsed others in the office to repeat these offensive remarks.

**XV.    Ms. Grossberg Complains About Mr. McCaskill's Unlawful Conduct Towards Her and, Just *Hours* Later, is Subjected to an Unfounded and Retaliatory Written <u>Warning from Her Harasser Himself, Mr. McCaskill.</u>**

293.    On January 12, 2023, after receiving yet another hostile and demeaning text message from Mr. McCaskill over the group text chain, Ms. Grossberg arrived at the office distraught and found herself alone with her superior, Mr. Fox.

294.    Ms. Grossberg took this opportunity to complain to Mr. Fox about the gender-based harassment she had been enduring at TCT and tell him that she felt constantly gaslit and belittled by Mr. McCaskill.  Ms. Grossberg made clear that she believed Mr. McCaskill behaved in a completely disrespectful manner towards women.

295.    Ms. Grossberg also told Mr. Fox that she felt constantly attacked by Mr. McCaskill and that his criticism of her in the group text was hindering her ability to do her job.  Ms. Grossberg further explained that Mr. McCaskill's tone and offensive language used in the group text was unacceptable, including him saying, "Am I being a dick or do I have a point here?"

296.    Mr. Fox responded to Ms. Grossberg both dismissively and shockingly: "We're all under stress.  *This is Tucker's tone and just the pace of the show."*

297.    In other words, Mr. Fox was admitting that the misogynistic fish rots from the head down – i.e., Mr. McCaskill behaved towards her in a deplorably discriminatory manner because he was inspired, permitted, and enabled to do so by Mr. Carlson himself.

298.    At approximately 2:45 pm that day, Mr. McCaskill arrived at the office and began speaking closely with Mr. Fox.

299.    Less than one hour later, at 3:26 pm, Mr. McCaskill informed Ms. Grossberg that he was scheduling an "HR meeting" for 4:00 pm to "discuss [her] work performance as Head of Booking."

300.    Ms. Grossberg was stunned by this blatantly retaliatory action.  Ms. Grossberg was bewildered by how her protected complaints to Mr. Fox about Mr. McCaskill's sexist conduct seemed to only enlarge the target on her back.

301.    As Ms. Grossberg rode the elevator to Fox News's HR department with Mr. Wells and Mr. McCaskill — who looked at each other and rolled their eyes — she began to feel warm and dizzy and was experiencing a racing heartbeat.

302.    Monica MeKeel, a Fox News HR Officer, presented Ms. Grossberg with a hastily drafted memo filled with half-truths and warned her that "*immediate improvement is required for you to fulfill the minimum standards expected as the Head of Booking."*

303.    During this meeting, Mr. Wells and Mr. McCaskell further berated and attacked Ms. Grossberg.  While they admitted to engaging in inappropriate and unprofessional conduct towards her, the two men claimed they did so out of frustration at Ms. Grossberg being "inept" and acting like a "secretary."

304.    Mr. Wells claimed Ms. Grossberg's "instincts and news judgement were way off." *When Ms. Grossberg tried to defend herself and keep the focus of the discussion on the horrid way in which she was being spoken to and the sexist and hostile work environment on the show, Mr. Wells ominously warned Ms. Grossberg, "I don't think being combative about it going forward after we leave here is going to help anyone.  I don't think it's going to help you do what you want to do either in this role or with your career."*

305.    In other, "keep complaining about discrimination and your career will be destroyed."

306.     Throughout the two-hour discussion, Mr. McCaskill spoke in a condescending manner to Ms. Grossberg, often raising his voice and interrupting her.  Indeed, Ms. Mekeel had to repeatedly admonish him to be "respectful."

307.     Ms. Grossberg also revealed that the harassment she had endured at TCT made it "hard to get up in the morning," and that because of the constant barrage of hostility and sexism she received from Mr. McCaskill and Mr. Wells, she would often escape to the "bathroom" because she felt as if she was going to "cry."

308.     At the end of the meeting, Mr. McCaskill finally acknowledged: "We can take that recommendation on both our parts in terms of collaborating a bit better in a more clear and concise way, in a way that isn't disrespectful."  Nevertheless, incredibly, Ms. Mekeel shifted the blame back onto Ms. Grossberg, saying "there are missteps probably in many different directions. But I'd say the bigger grander picture of all of this is the things that are expected in this role have not been fulfilled."

309.     Nevertheless, after the meeting ended, Ms. Grossberg stayed behind to speak with Ms. Mekeel alone, and recited the countless examples of sexism and antisemitism recounted *supra* to her.

310.     Ms. Mekeel claimed that she would investigate and "get back to" Ms. Grossberg, but, to date, no meaningful investigation into Ms. Grossberg's discrimination complaints has occurred.

**XVI.   Ms. Grossberg Engages in Further Protected Activity by Requesting FMLA Leave as a Reasonable Accommodation but Continues to Suffer Discrimination and <u>Retaliation, and Interference with Her FMLA Rights.</u>**

311.     After the January 12, 2023, meeting with Ms. Mekeel, Mr. Wells, and Mr. McCaskill, Ms. Grossberg held out hope that the harassment towards her would cease.  However,

the very next day, Ms. Grossberg found herself under an even bigger microscope, as Mr. McCaskill, Mr. Wells, and Mr. Fox suddenly began questioning virtually every decision she made. This caused Ms. Grossberg to become even more anxious and physically ill.

312.    Ms. Grossberg also heard nothing back from Ms. Mekeel or anyone else from the HR department despite her very serious allegations of discrimination, harassment, and retaliation.

313.    On January 17, 2023, feeling utterly hopeless, Ms. Grossberg contacted a Crisis Hotline.

314.    The next day, January 18, 2023, Ms. Grossberg had to call out sick, and was advised by her therapist to immediately request leave under the FMLA to reasonably accommodate and treat her diagnosis of depression and anxiety, which was being exacerbated by the harassment she continued to experience at work.

315.    On January 18, 2023, Ms. Grossberg requested FMLA leave through February 1, 2023, at which point her therapist would re-evaluate her.

316.    On January 26, 2023, Ms. Grossberg requested an extension of her FMLA leave until February 8, 2023, and attached a letter from her therapist stating, "Ms. Grossberg's anxiety symptoms continue to be clinically significant, and it is my opinion that they will worsen if she returns prematurely.  Ms. Grossberg does not feel emotionally safe to return to her workplace.  In order to transition back, ***she will need guidance and assurance from Human Resources that the work environment will remain harassment free***."

317.    On February 6, 2023, Ms. Grossberg requested an additional extension of her FMLA leave until February 15, 2023, and provided another letter from her therapist stating, "Ms. Grossberg's anxiety symptoms have not abated sufficiently for me to recommend her return to

work particularly since the clinical anxiety and depression were caused by events that occurred in the workplace."

318.    On February 9, 2022, Ms. Grossberg spoke to Ms. Mekeel about her eventual transition back to work from FMLA leave, and to get an update about the Company's purported investigation into her claims of harassment and discrimination that she had made back on January 12, 2022.

319.    Ms. Grossberg began the conversation by saying that it was her "goal to come back to work," but that her therapist "suggested that we have this conversation to assess if I'm ready and the safety and the health of the environment."  Ms. Grossberg asked Ms. Mekeel "what steps have been taken and what's being done" about the hostile work environment she endured at TCT.

320.    Ms. Mekeel explained that she had "reach[ed] out to a few members of the team to kind of get their thoughts [about] not only religious but gender discrimination." Specifically, Ms. Mekeel mentioned she spoke to a "few members on the team," but that **there was "no corroboration on those feelings similar to what you were feeling."** Ms. Mekeel further noted that that Mr. Fox had confirmed that Ms. Grossberg complained to him about Mr. McCaskill, but that he believed "it was just…a feeling about a co-worker."

321.    Ms. Grossberg questioned the veracity of this so-called "investigation," and maintained that there was an upsetting "culture" on TCT that needed to be investigated and remedied.

322.    Ms. Grossberg then proceeded to provide Ms. Mekeel with countless additional examples of the discrimination she faced while working for Ms. Bartiromo, as recounted *supra*, to which Ms. Mekeel dismissively replied, it is "certainly not appropriate, not something that any employee has to endure, **but now you've been moved to the Tucker show."**  Ms. Grossberg

explained how the hostile work environment "continue[d] there …it's a broader problem, culturally, and … it's been ongoing…and it's really upsetting as a woman as a human, to not feel respected in that way." Ms. Grossberg further expressed, "I tolerated it and I discussed it with Maria [Bartiromo] and I kind of put up with it.  Here [at TCT], it's just really not bearable." Ms. Mekeel acknowledged that she needed to investigate Ms. Grossberg's accusations and determine whether there is a culture that needed to be altered and promised to touch base with Ms. Grossberg the following week.

323.    On Tuesday, February 14, 2022, after not having heard back from Ms. Mekeel as to whether any corrective actions were being taken to put an end to the toxic, misogynist culture on TCT, Ms. Grossberg requested an extension of her FMLA leave, telling Ms. Mekeel: "In light of the concerns that I raised last week about returning to a healthy work environment, and ***the fact that I have not received any assurances from human resources that the harassment and discrimination I've experienced has been investigated and will not continue***, I am still experiencing anxiety about returning to work on Wednesday."  Ms. Grossberg's therapist supported Ms. Grossberg' request to extend her FMLA leave and stated, "Ms. Grossberg's anxiety symptoms continue to be clinically significant, and it is my opinion that they will worsen if she returns prematurely.  Ms. Grossberg does not feel emotionally safe to return to her workplace.  To transition back, she will need guidance and assurance from Human Resources that the work environment will remain harassment free."

324.    Ms. Mekeel dismissively responded to Ms. Grossberg's concerns: "we do not agree with … [your therapist's] unfounded assertion that the workplace is not harassment free."

325.    On February 16, 2023, Fox News interfered with Ms. Grossberg' exercise of her rights under the FMLA and further discriminated and retaliated against her by not paying Ms.

Grossberg utilizing her accrued paid leave benefits in violation of Fox News' own policy regarding paying employees with accrued paid leave benefits while such employees are on FMLA leave.

326.    On February 27, 2023, Ms. Grossberg returned to the TCT office from her FMLA leave, and once again, was subjected to a hostile work environment plagued with derogatory comments about women.

327.    For example, later that same day, Mr. Fox showed Mr. McCaskill a video of a muscular woman doing CrossFit, whom Mr. McCaskill called a "eunuch" — in fact, it was U.S. Representative Marjorie Taylor Green.

328.    In the ensuing days, Mr. McCaskill and Mr. Fox excluded Ms. Grossberg from relevant and necessary communications and proceeded to undermine her authority as Head of Booking by giving junior staffers on her team assignments without her knowledge.  For example, Mr. McCaskill and Mr. Fox directed junior staffers to book certain guests in a text message chain that purposely excluded Ms. Grossberg and was meant to keep her in the dark and undoubtedly gaslight her.

329.    Thereafter, on March 1, 2023, Ms. Grossberg once again raised concerns about the continued harassment to Ms. Mekeel, but her complaint fell on deaf ears.  Neither Ms. Mekeel nor any other representative from Human Resources acknowledged Ms. Grossberg's complaint, while Mr. McCaskill took the opportunity to respond mockingly and gaslight Ms. Grossberg.

330.    On March 8, 2023, Ms. Grossberg continued to express frustration with her superiors, in particular Mr. Fox, for assigning booking tasks to researchers without her knowledge, and politely asked to be "looped in."

331.    On March 9, 2023, during an editorial meeting with Mr. Wells, Mr. Fox, and Line Producer Casey Herzog, Mr. Wells exclaimed that he would need to get a new phone number

because an unidentified woman from Chicago was sending him photos of her breast implants and proceeded to uninvitedly show the group the photos.

332.    Then, on March 13, 2023, at approximately 12:33 pm, Mr. Fox once again loudly and offensively demeaned yet another prominent female politician, South Dakota Governor Kristi Noem, who had just appeared as a guest on TCT days earlier

> Mr. Fox: You expect her to be dumb because of how she looks... she's not fun enough and Tucker likes fun.

> Mr. Yaron: I guess she's kind of icy, but she explained a complex topic.

> Mr. Fox: She's boring. But good for her I guess for making people care about South Dakota.

333.    On March 14, 2023, the conversation on the newsroom floor mockingly turned towards Jewish people when Mr. Neret loudly posited the following question to the TCT group: "Do Jews having middle names?" Mr. Kass, who is Jewish himself replied, "Why would you ask that, of course we do." Producer Elizabeth Fanning tried to temper the conversation, "Remember everyone, we love our Jewish people here." Mr. Carmichael then exclaimed, to much laughter from all, "Eduardo [Neret], you are not behaving over there."

334.    Throughout this time, Mr. Wells and Mr. Fox continued to unfairly scrutinize Ms. Grossberg's every move.   For instance, on March 14, 2023, Mr. Fox wrongly blamed Ms. Grossberg for not booking a guest named Megan Basham whom Mr. Carlson had requested to be on the show the week prior.  Ms. Basham was in fact slated to appear as a guest on March 9, 2023, but Mr. Wells cancelled her appearance.

**XVII. Fox News, in Line With its *Modus Operandi* When it Comes to Punishing Brave Women Who Speak Out Against Sexism and Misogyny at the Network, Not Only Files a Baseless Retaliatory Preemptive Lawsuit Against Ms. Grossberg Meant Only to Chill and Silence Her and Deter Other Courageous Women from Following in Her <u>Footsteps, but Places Her on Forced Administrative Leave.</u>**

335.    On March 20, 2023, Plaintiff and her counsel met with Defendants' counsel and a corporate representative for the Entity Defendants to attempt to resolve Ms. Grossberg's legal claims asserted herein.

336.    When Ms. Grossberg did not agree to Fox News's terms of settlement, part and parcel to their *modus operandi* of doing anything it can to silence women who have been violated by the Company, Fox News immediately, within minutes, sued Ms. Grossberg in a clear and blatant act of unlawful retaliation.

337.    At approximately 4:00pm, Ms. Grossberg was contacted by a reporter asking for her comment about a lawsuit Fox News had just filed against her seeking a declaratory judgment and injunctive relief in New York Supreme Court.

338.    As referenced above, this is not the first preemptive lawsuit involving a female Fox News staffer.  Andrea Mackris, who accused Bill O'Reilly of sexual harassment in 2004, filed her lawsuit several hours after O'Reilly accused her and her lawyer of extortion.

339.    Fox News went into its old playbook to try to deny Ms. Grossberg's right to bring this instant action against it and its top executives on baseless, flimsy grounds, in a desperate and retaliatory bid to stop her story from being told.

340.    Fortunately, Ms. Grossberg refuse to be silenced, as her story is needed to bring justice not just to her, but to the scores of other women who have been unlawfully marginalized, diminished, dismissed, and treated inferiorly to men at the Network.

341.    In addition to suing her hours later, on March 20, 2023, Fox News retaliatorily placed Ms. Grossberg on forced administrative leave, effectively bringing an end to Ms. Grossberg's career at the Network.  Thereafter, she was locked out of her work email and denied access to various work applications.

342.    Fox News, through the actions of its attorneys yet again, sent a clear message to victims of discrimination and harassment – *Speak out, and **you** are out.*

343.    On Tuesday, March 21, 2023, Ms. Grossberg's counsel appeared at the New York County Supreme Court shortly after 9:00am and learned that Fox New Network's application for a temporary restraining order had not yet been processed or assigned to a judge.  The case was ultimately assigned to Justice Jennifer G. Schecter, whose chambers indicated that the hearing would take place virtually.

344.    Then, at approximately noon attorney Paul Evans of Baker & McKenzie LLP filed a "Notice of Discontinuance" on behalf of Fox News to "discontinue[] this proceeding, without prejudice."  Justice Schecter subsequently issued an order disposing of the lawsuit as "moot." At no point did any Fox News representative or attorney appear at the New York County Supreme Court to pursue its frivolous lawsuit.

## XVIII. Fox News Hammers the Final Nail in the Coffin of Ms. Grossberg's Career by Unlawfully Terminating Her Employment Because She Corrected Her Deposition <u>Testimony for Accuracy and Completeness.</u>

345.    In yet another thinly veiled act of retaliation, on Friday, March 24, 2023, Fox News sought to mask its continued unlawful conduct against Ms. Grossberg by pretextually firing her for "acting contrary to express instructions of the Company."  Specifically, Fox News alleged that Ms. Grossberg improperly disclosed information regarding the Dominion/Fox Lawsuit that the Company purportedly believed was privileged.

346.     According to a report published in *Variety* that same evening, Fox News misleadingly stated that: "[l]ike most organizations, Fox News Media's attorneys engage in privileged communications with our employees as necessary ***to provide legal advice*** … . We were clear that if she violated our instructions, Fox would take appropriate action including termination … Ms. Grossberg ignored these communications and chose to file her complaint without taking any steps to protect those portions containing Fox's privileged information.

347.     Of course, the undisputed events that immediately preceded Ms. Grossberg's discriminatory and retaliatory termination belie the Company's false and pretextual statements.

348.     In reality, Fox News ***sued Ms. Grossberg when she refused to buckle to their ultimatums and fired her after she filed two lawsuits asserting her legal rights*** as a woman (to enjoy a workplace without misogynistic discrimination, retaliation, or harassment) and as a citizen (to be free from bullying and coercion when testifying).

349.     As referenced above,  at approximately 4pm on Monday, March 20, 2023, Fox News filed suit against Ms. Grossberg in New York State Supreme Court alleging that she had violated privileges belonging to the Company and seeking to gag Ms. Grossberg immediately.

350.     This occurred just ***minutes*** after she refused the Company's ultimatum to resolve her claims of gender-based discrimination, retaliation, and harassment, and before Ms. Grossberg filed any lawsuit.

351.     ***Approximately 90 minutes later,*** Ms. Grossberg, through her counsel, sent an errata sheet correcting her previously coerced and less-than-complete deposition testimony in the Dominion/Fox Lawsuit to Dominion's counsel, with notice to Fox News, which ***was exactly what the Company, through its counsel, had instructed Ms. Grossberg to do that same day.***

352.    Later that evening, Ms. Grossberg filed the instant action against Fox News as well as an action against it the Superior Court of Delaware.

353.    The next day, March 21, 2023, Ms. Grossberg's counsel appeared in court to challenge the frivolous lawsuit filed by Fox News, but the Company failed to appear, and hours later, after a judge was assigned to hear its arguments, Fox News *voluntarily dismissed its action to enforce these phantom privileges*.

354.    On the day after that, March 22, 2023, Fox News filed a self-styled "Emergency Motion" in the instant action to attempt again to gag Ms. Grossberg, which the Court disposed of *sua sponte* the next day, finding that Fox News "cannot put the genie back in the bottle and 'make what has … become public private again.'"

355.    So, with egg on its face, Fox News decided to end the torturous path it started four days earlier by firing Ms. Grossberg for disclosing what the Company wanted silenced.

356.    In other words, when Fox News realized that it could not stop Ms. Grossberg from speaking her truth to the world in her immutable "public filings" – either by intimidation, obfuscation, or baseless attempts at judicial intervention – it terminated her employment.

357.    While Fox News may have been able to unlawfully end her journalistic career for allegedly disobeying its "express instructions," the Company's legally confused and clearly unlawful and retaliatory conduct will never silence Ms. Grossberg's voice.

358.    Accordingly, as set forth above, Defendants have unlawfully subjected Ms. Grossberg to a toxic work environment that is hostile to women like her, and rife with blatant and frequent acts of discrimination with respect to the terms and conditions of her employment in comparison to male employees.  Fox News has also blatantly and callously retaliated against her for engaging in protected activity, including, but not limited to, her filing of the instant action, by,

*inter alia*, terminating her employment.  As a result, Ms. Grossberg has been significantly damaged

— economically, emotionally, and reputationally — and brings the instant action to obtain from

Defendants and to put an end to the discriminatory and hostile work environment she and other

female Fox News employees have had to endure for far, far too long.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violations of the Federal Equal Pay Act, 29 U.S.C. § 206 *et seq.*
*Against Entity Defendants*

359.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

as if fully and completely stated herein. During the period of Plaintiff's employment, Entity

Defendants were subject to the provisions of the federal Equal Pay Act.  During that time, Entity

Defendants required Plaintiff to perform the same or substantially the same job position as male

employees, requiring equal skill, effort, and responsibility under similar working conditions at the

same establishment, and paid Plaintiff at a rate of pay less than such male employees.  The

differential rate of pay was not part of or occasioned by a seniority system, merit system, a system

based on the quantity or quality of production, or upon a factor other than gender. Entity

Defendants engaged in patterns, practices, and/or policies of employment that discriminated

against Plaintiff on the bases of her gender and by paying Plaintiff a lesser rate of pay than that

paid to male employees performing the same or substantially similar job duties which require equal

skill, effort, and responsibility, and under the same working conditions and at the same

establishment.

360.    By the actions described above, Entity Defendants have violated the federal Equal

Pay Act. As a direct and proximate result of Entity Defendants' unlawful and discriminatory

conduct in violation of the federal Equal Pay Act, Plaintiff has suffered, and continues to suffer,

harm for which she is entitled to an award of monetary damages and other relief.

361.    Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Interference In Violation of FMLA, 29 U.S.C. § 2615(a)(1)**
*Against Entity Defendants*

362.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein.

363.    Section 2612(D) of the Family Medical Leave Act, states in pertinent part: "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period … Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

364.    Section 2615(a)(1) of the Family Medical Leave Act, states in pertinent part: "Interference with rights.  Exercise of rights.  It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

365.    To state a *prima facie* claim for interference under the FMLA, a plaintiff must allege the following: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied to which she was entitled under the FMLA.

366.    Upon information and belief, Plaintiff and the Entity Defendants are subject to the FMLA, respectively, as an eligible employee and covered employer.

367.    Plaintiff was entitled to take leave under the FMLA, as she had not used FMLA leave in the preceding twelve months and calendar year as of January 17, 2023.

368.    Plaintiff gave notice of her intention to take FMLA leave on or about January 18, 2023, January 26, 2023, and February 6, 2023.

369.    Entity Defendants interfered with Plaintiff's rights under the FMLA by, *inter alia*, failing to pay her during her FMLA leave as was required by company policy, effectively depriving her of her FMLA rights.

370.    As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described herein, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice, and is entitled to all available costs, including, but not limited to, liquidated damages, attorneys' fees, and litigation costs.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Retaliation In Violation of FMLA, 29 U.S.C. § 2615(a)(2) and (b)**
*Against Entity Defendants*

371.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein.

372.    Section 2615(a)(2) of the Family Medical Leave Act, states in pertinent part: "Discrimination.   It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

373.    To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that: 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

374.    Upon information and belief, Plaintiff and the Entity Defendants are subject to the FMLA, respectively, as an eligible employee and covered employer.

375.    Plaintiff was entitled to take leave under the FMLA, as she had not used FMLA leave in the preceding twelve months and calendar year as of January 17, 2023.

376.    Plaintiff exercised rights protected under the FMLA by requesting leave on or about January 18, 2023, January 26, 2023, and February 6, 2023.

377.    In response to Plaintiff's activities, which were protected conduct under the FMLA, the Entity Defendants wrongfully retaliated against Plaintiff by, *inter alia*, failing to pay her during her FMLA leave as was required by company policy, effectively depriving her of her FMLA rights, discriminating against her with respect to the terms and conditions of her employment, harassing Plaintiff, placing her on administrative leave, and ultimately, firing her.

378.    As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described in this Complaint, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice, and is entitled to all available costs, including, but not limited to, liquidated damages, attorneys' fees, and litigation costs.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violations of the New York Pay Equity Law, NYLL § 194 *et seq.*
*Against Entity Defendants*

379.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

380.     During the period of Plaintiff's employment, Entity Defendants were subject to the provisions of the New York Equal Pay Act.  During that time, Entity Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

381.     Entity Defendants engaged in patterns, practices, and/or policies of employment that discriminated against Plaintiff on the bases of her gender and by paying Plaintiff a lesser rate of pay than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishment.

382.     By the actions described above, Entity Defendants have violated the New York Labor Law.

383.     As a direct and proximate result of Entity Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

384.     Plaintiff is further entitled to treble damages, reasonable costs, and attorneys' fees.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Gender Discrimination in Violation of New York State Human Rights Law (NYSHRL),**
**New York Executive Law § 296(1)**
*Against All Defendants*

385.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

386.    New York Executive Law Section 296(1)(a) provides that: "It shall be an unlawful discriminatory practice …[f]or an employer … because of an individual's …sex… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

387.    Defendants discriminated against Plaintiff in the terms and conditions of her employment based on her gender in violation of the NYSHRL by, including, but not limited to, failing to promote her, subjecting her to a hostile work environment, refusing to adequately investigate her claims of discrimination, and providing less effective legal counsel and representation with regards to her deposition preparation than afforded to her similarly situated male colleagues.

388.    To establish a *prima facie* discriminatory failure to promote case, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was rejected for the position; and (4) the circumstances of the adverse employment decision give rise to an inference of discrimination.

389.    Plaintiff is a woman and thus a member of a protected class under Section 296(1)(a) of the New York Human Rights Law.

390.    Plaintiff was eminently qualified to serve as Executive Producer of SMFMB, and as the only employee exclusively dedicated to the show, she effectively performed her job responsibilities to a high standard *as well as* the role of Executive Producer for several years, without the title and corresponding pay increase.  This is supported by, *inter alia*, the strong viewership ratings earned by SMFMB under her direction, confirmation on the part of Ms. Petterson that Plaintiff was talented, and Ms. Bartiromo's admissions that Mr. Faulkner "constantly" makes "dumb mistakes."

391.    Nevertheless, Defendants passed Ms. Grossberg over for a promotion to Executive Producer of SMFMB after the role was open and advertised in or about October 2021.  When Plaintiff attempted to apply, she was told by Fox Senior Executives Lauren Petterson and Ralph Giordano that they wanted to hire a man for the position because they needed someone who could exert "control" over Ms. Bartiromo.  Ultimately, Mr. Faulkner was hired to replace Ms. Grossberg after she accepted a position with TCT, and immediately received the Executive Producer title, despite being deemed unqualified by Ms. Bartiromo on multiple occasions.

392.    New York Executive Law Section 296(1)(h) provides that: "It shall be an unlawful discriminatory practice …[f]or an employer…to subject any individual to harassment because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, status as a victim of domestic violence, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, *regardless of whether such harassment would be considered severe or pervasive* under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to *inferior terms, conditions, or privileges of employment because of the individual's membership in one or more of these protected categories*.  The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable.  Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared.  It shall be an affirmative defense to liability under this subdivision that the harassing

conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences" (emphasis added).

393.    To establish a *prima facie* case of a hostile work environment under the NYSHRL, a plaintiff must allege that she has been subjected to inferior terms, conditions, or privileges of employment because of her protected status under the NYSHRL, or she has been treated less well than other employees because of her protected status.

394.    Based on the conduct alleged herein, Plaintiff has asserted countless instances during her time on both SMFMB and TCT where she was treated less well than male employees because of her gender, including but not limited to, being belittled and subjected to sexist tropes (*i.e.*, "stay at home", "crazy bitch", "diva"), not credited for producing shows, required to spy on and report back to management about Ms. Bartiromo, denied vital support and assistance, including Production Assistants (in comparison to male-run weekly shows), sent harassing communications and told to "not subvert" Mr. Carlson, being ignored and shut out of meetings, and being spoken down to in an effort to undermine her authority.

395.    Defendants knew about Ms. Grossberg's discrimination and harassment, including through her various protected complaints to Ms. Petterson, Mr. Andrews, Ms. West, Mr. Fox, and Ms. Mekeel, yet failed to conduct a proper investigation or otherwise address and remedy the underlying discrimination and harassment in every instance.  Plaintiff was explicitly coached during her deposition preparation to downplay any complaints she had made about said harassment, in a blatant effort to cover-up the hostile work environment that is pervasive at Fox News, among other reasons.

396.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

397.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Gender Discrimination in Violation of New York City Human Rights Law (NYCHRL),**
**N.Y. Administrative Code § 8-107**
*Against All Defendants*

398.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

399.    The NYCHRL makes it unlawful for an employer to discriminate against an employee in the terms, conditions or privileges of employment based on gender.

400.    NYC Administrative Code 8-107(1) provides that: "It shall be an unlawful discriminatory practice: (a) [f]or an employer or an employee or agent thereof, because of the actual or perceived … gender… of any person: (1) To represent that any employment or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

401.    To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive.  The NYCHRL must be construed broadly in favor of discrimination plaintiffs, to the extent that such a construction is

reasonably possible to include differential treatment of a much broader degree than required under the NYSHRL.

402.   Defendants discriminated against Plaintiff in the terms and conditions of her employment based on her gender in violation of the NYCHRL by, including, but not limited to, failing to promote her, subjecting her to a hostile work environment, refusing to adequately investigate her claims of discrimination, and providing less effective legal counsel and representation with regards to her deposition preparation than afforded to her similarly situated male colleagues.

403.   Under the NYCHRL, liability for a hostile work environment claim is proven where a plaintiff proves that he or she was treated less well than other employees because of the relevant characteristic.

404.   Based on the conduct alleged herein, Plaintiff was marginalized, humiliated, and discriminated against by Fox News because she is a woman.

405.   As a direct and proximate result of the discriminatory, harassing, and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

406.   Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Retaliation in Violation of New York State Human Rights Law (NYSHRL),
### New York State Executive Law § 296(7)
*Against All Defendants*

407.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

408.    New York Executive Law Section 296(7) provides that: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate against any person because he or she person has opposed any practice forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

409.    A plaintiff makes a *prima facie* case for retaliation under the NYSHRL by showing that (1) she engaged in a protected activity, (2) the employer was aware of the protected activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse or disadvantageous action.

410.    Plaintiff engaged in protected activity by complaining, inter alia, to Ms. Petterson and Mr. Andrews about the hostile work environment and discrimination based on gender inflicted upon her by Fox News employees, including, but not limited, to Mr. Clark, to Mr. Fox about the hostile work environment and discrimination based on gender inflicted upon her by Fox News employees, including, but not limited to, Mr. Wells and Mr. McCaskill, and to Ms. Mekeel about the hostile work environment and discrimination based on gender inflicted upon her by Fox News employees, including, but not limited to, Ms. Petterson, Mr. Clark, Mr. Andrews, Mr. Wells and Mr. McCaskill.

411.    Instead of addressing her reports and complaints, Defendants subjected Plaintiff to further mistreatment by, *inter alia*, denying her a promotion to Executive Producer,  denying her

effective legal representation and the opportunity to review and correct, if necessary, her deposition transcript, despite affording the same opportunity to male colleagues, scheduling a meeting with Human Resources mere hours after she complained to Mr. Fox about gender discrimination and harassment, during which Plaintiff was hostilely confronted by her harassers, Mr. Wells and Mr. McCaskill, issued a baseless written warning, and baselessly claiming that there was "no corroboration" on her "feelings," and dismissing her complaints about her experiences at SMFMB because she has "been moved to the Tucker show," preemptively filed a lawsuit against Ms. Grossberg, and placed her on forced administrative leave.

412.    Defendants' retaliatory tactics were reasonably likely to deter a person from engaging in protective activity, such as complaining about discrimination.

413.    As a direct and proximate result of the retaliatory conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

414.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### Retaliation in Violation of New York City Human Rights Law (NYCHRL),
### N.Y. Administrative Code § 8-107(7)
*Against All Defendants*

415.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

416.     NYC Administrative Code 8-107(7) provides: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or (vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter."

417.     A plaintiff makes a *prima facie* case for retaliation under the NYCHRL by showing that (1) she engaged in a protected activity, (2) the employer was aware of the protected activity, (3) the employer took an action that disadvantaged the plaintiff, and (4) there was a causal connection between the protected activity and the adverse or disadvantageous action.

418.     Plaintiff engaged in protected activity, as detailed supra.

419.     Defendants knew that Plaintiff had engaged in protected activity, as detailed *supra*.

420.     Defendants subjected Plaintiff to actions that disadvantaged her, as detailed *supra*, in relation to her employment that were based upon her protected activity, as detailed *supra*.

421.     The disadvantageous actions taken against Plaintiff were a direct result of her engagement in protected activity at Fox News and were reasonably likely to deter her from engaging in protected activity, as detailed supra.

422.     As a direct and proximate result of the discriminatory, harassing, and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its

employees and managers, including loss of wages, professional opportunities, and other valuable

benefits and emoluments of employment, as well as severe mental, physical and emotional stress,

pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and

personal sickness, loss of enjoyment of life and damage to her reputation.

423.    Defendants' conduct was willful and motivated by malice and/or reckless

indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Religious Discrimination in Violation of New York State Human Rights Law (NYSHRL),**
**New York State Executive Law § 296**
*Against Defendants Fox News Network, Mr. Carlson, Mr. Wells, and Mr. McCaskill*

424.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

as if fully and completely stated herein.

425.    New York Executive Law Section 296(1)(a) provides that: "It shall be an unlawful

discriminatory practice …[f]or an employer …, because of an individual's … creed… to refuse to

hire or employ or to bar or to discharge from employment such individual or to discriminate against

such individual in compensation or in terms, conditions or privileges of employment."

426.    To establish a *prima facie* case of a hostile work environment under NYSHRL

plaintiff must allege that she has been subjected to inferior terms, conditions, or privileges of

employment because of her protected status under the NYSHRL, or she has been treated less well

than other employees because of her protected status.

427.    Plaintiff is Jewish and thus a member of a protected class under Section 296(1)(a)

of the New York Human Rights Law.

428.    Defendants Mr. McCaskill and Mr. Wells, discriminated against Plaintiff in the

terms and conditions of her employment based on her religion (Judaism) in violation of the

NYSHRL by creating an intimidating, hostile, and offensive working environment where those of

88

the Jewish faith were ridiculed for observing traditional holidays, held out as token employees to win "sham" diversity awards, disparaged for their traditional foods, and holding other faiths clearly in higher regard.

429.    Fox News knew about Ms. Grossberg's discrimination and harassment through her complaints to Ms. Mekeel but failed to take appropriate action to correct it.

430.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

431.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

### AS AND FOR AN TENTH CAUSE OF ACTION
### Religious Discrimination in Violation of New York City Human Rights Law,
### N.Y. Administrative Code § 8-107
*Against Defendants Fox News Network, Mr. Carlson, Mr. Wells and Mr. McCaskill*

432.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

433.    The NYCHRL makes it unlawful for an employer to discriminate against an employee in the terms, conditions or privileges of employment based on gender.

434.    NYC Administrative Code 8-107(1) provides that: It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived … gender… of any person: (1) To represent that any employment or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or to discharge from

employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

435.   To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive.  The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" to include differential treatment of a much broader degree than required under the NYSHRL.

436.   Under the NYCHRL, liability for a hostile work environment claim is proven where a plaintiff proves that he or she was treated less well than other employees because of the relevant characteristic.

437.   Plaintiff was treated less well and was marginalized, humiliated, and discriminated against by Defendants Wells and McCaskill because of her Jewish faith, as detailed *supra*.

438.   As a direct and proximate result of the discriminatory, harassing, and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

439.   Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Failure to Accommodate Disability in Violation of New York State Human Rights Law**
**(NYSHRL), New York State Executive Law § 296**
*Against Entity Defendants*

440.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein at length.

441.    The NYSHRL makes it unlawful for an employer to discriminate against an employee in the terms, conditions, or privileges of employment based on disability.

442.    New York Executive Law Section 296(1)(a) provides that: "It shall be an unlawful discriminatory practice …[f]or an employer … because of an individual's …disability… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

443.    Defendants discriminated against Plaintiff in the terms and conditions of her employment based on her disability in violation of the NYSHRL by, inter alia, failing to accommodate her.

444.    To state a *prima facie* case of a failure to accommodate under the NYSHRL, the plaintiff must allege facts to suggest that: "(1) the employee has a disability under the relevant statute, (2) an employer covered by the statute had notice of [her] disability, (3) with reasonable accommodations, [she] could perform the essential functions of [her] job, and (4) [her] employer refused to make such accommodations."

445.    The NYSHRL affirmatively requires that, even in the absence of a specific request, an employer shall make reasonable accommodation to enable a person with a disability  to satisfy the essential requisites of a job, provided that the disability is known or should have been known to the employer."

446.    Mental health disabilities, including depression and anxiety, constitute a protected disability under the NYSHRL.

447.    Ms. Grossberg suffers from depression and anxiety, which was exacerbated by the discrimination she endured in the workplace.

448.    Ms. Mekeel, among others at Fox News, was aware of the mental toll Ms. Grossberg experienced because of Mr. McCaskill's and Mr. Well's harassment, including that she would at times need to "go into the bathroom" because she felt she was about to "cry," yet, Ms. Mekeel took no remedial action and sent Ms. Grossberg right back into the same harassing work environment.  Neither Ms. Mekeel, nor any other Fox News employee, made Ms. Grossberg aware of possible accommodations that she could avail herself of.

449.    After Ms. Grossberg suffered a complete mental and nervous breakdown, her therapist advised her that returning to the workplace would be detrimental to her health, resulting in her request for FMLA leave.

450.    As a direct and proximate result of Defendants' conduct, Ms. Grossberg has suffered, and continues to suffer, loss of stature, damage to her career path, adverse job consequences, including economic damages, severe mental, physical, and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

451.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

## AS AND FOR A TWELFTH CAUSE OF ACTION
**Failure to Accommodate Disability in Violation of the New York City Human Rights Law,
N.Y. Administrative Code § 8-107**
*Against Entity Defendants*

452.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding
paragraphs of this Complaint as if set forth herein at length.

453.    The NYCHRL makes it unlawful for an employer to discriminate against an
employee in the terms, conditions or privileges of employment based on disability.

454.    NYC Administrative Code 8-107(1) provides that: It shall be an unlawful
discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual
or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership
status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed
service or immigration or citizenship status of any person: (1) To represent that any employment
or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or
to discharge from employment such person; or (3) To discriminate against such person in
compensation or in terms, conditions or privileges of employment."

455.    Mental health disabilities, including depression and anxiety constitute a protected
disability under the NYCHRL.

456.     To state a *prima facie* case of a failure to accommodate under the NYCHRL, just
as it is under NYSHRL, the plaintiff must allege facts to suggest that: (1) the employee has
a disability under the relevant statute, (2) an employer covered by the statute had notice of
[her] disability, (3) with reasonable accommodations, [she] could perform the essential functions
of [her] job, and (4) [her] employer refused to make such accommodations.

457.    Ms. Grossberg suffers from depression and anxiety, which was exacerbated by the
discrimination she endured in the workplace.

93

458.   Ms. Mekeel, among others at Fox News, was aware of the mental toll Ms. Grossberg experienced because of Mr. McCaskill's and Mr. Well's harassment, including that she would at times need to "go into the bathroom" because she felt she was about to "cry," yet, Ms. Mekeel took no remedial action and sent Ms. Grossberg right back into the same harassing work environment.  Neither Ms. Mekeel, nor any other Fox News employee, made Ms. Grossberg aware of possible accommodations that she could avail herself of.

459.   After Ms. Grossberg suffered a complete mental and nervous breakdown, her therapist advised her that returning to the workplace would be detrimental to her health, resulting in her request for FMLA leave.

460.   As a direct and proximate result of Defendants' conduct, Ms. Grossberg has suffered, and continues to suffer, loss of stature, damage to her career path, adverse job consequences, including economic damages, severe mental, physical, and emotional stress, pain and suffering, anxiety, stress, humiliation, exacerbation of existing medical conditions and personal sickness, loss of enjoyment of life and damage to her reputation.

461.   Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling her to an award of punitive damages.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION**
**Aiding And Abetting Unlawful Discrimination and Retaliation in Violation of the New York State Human Rights Law**
***Against Individual Defendants***

462.   Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein at length.

463.   New York Executive Law Section 296(6) provides that: it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

464.    By the actions described above, among others, Defendants Clark, Andrews, West, Carlson, Wells and McCaskill knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and/or retaliation to which Plaintiff was subjected in violation of the NYSHRL.

465.    As a direct and proximate result of Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

466.    As a direct and proximate result of Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

467.    Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful and/or retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Aiding And Abetting Unlawful Discrimination and Retaliation in Violation of the New York City Human Rights Law**
***Against Individual Defendants***

468.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein at length.

469.    New York City Administrative Code Section 8-107(6) provides that: it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

470.   By the actions described above, among others, Defendants Clark, Andrews, West, Carlson, Wells and McCaskill knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and/or retaliation to which Plaintiff was subjected in violation of the NYCHRL.

471.   As a direct and proximate result of Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

472.   As a direct and proximate result of Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

473.   Defendants Clark, Andrews, West, Carlson, Wells and McCaskill's unlawful and/or retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**Actions Involving Public Petition and Participation in Violation of the New York Civil Rights Law § 70-a**
*Against Entity Defendants*

474.   Plaintiff repeats and realleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein at length.

475.   To establish a *prima facie* case for violation of New York Civil Rights Law § 70-a, a plaintiff must establish that (1) an action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law; (2) the action

involving public petition and participation was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights; and (3) the action involving public petition and participation was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights.

476.    The Entity Defendants commenced an action in New York State Supreme Court without a substantial basis in fact and law that could not be supported by a substantial argument for the extension, modification or reversal of existing law and did so to threaten and silence Ms. Grossberg in her exercise of her rights to publicly address the discriminatory practices of Fox News and to petition this court and other law enforcement agencies to address the unlawful and discriminatory practices of Fox News.

477.    In its abuse of process, Fox News used the state courts in a perverted manner to obtain advantage against Ms. Grossberg in other courts and with the law enforcement agencies that Ms. Grossberg planned to complain about Fox News's unlawful, discriminatory, and harassing treatment of female employees and Fox News's commencement of that action was for the sole purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of speech and petition rights of Ms. Grossberg.

478.    By the actions described above, Fox News knowingly or recklessly violated New York Civil Rights Law § 70-a.

479.    As a direct and proximate result of the Entity Defendants' unlawful and wrongful actions or omissions against Plaintiff, as described herein, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; (e) loss of

ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice; and (f) the costs associated with defending herself against Defendants' actions, entitling her to all available damages, including, but not limited to, punitive damages.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Abuse of Process
*Against Entity Defendants*

480.    Plaintiff repeats and realleged the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein at length.

481.    A *prima facie* case for abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective.

482.    Upon information and belief, the Entity Defendants used intimidation tactics and misinformation to cause Ms. Grossberg to sit for a deposition in the Dominion/Fox Lawsuit, for which she was intentionally ill-prepared and misinformed by the Entity Defendants.

483.    For months, the Entity Defendants inappropriately denied Ms. Grossberg a copy of her deposition transcript to review and correct as was her right under the applicable court rules.

484.    The Entity Defendants also used the threat and filing of a complaint and application for injunctive relief in the Supreme Court of New York with the intent to infringe upon Ms. Grossberg's rights to publicly address the discriminatory practices of Fox News and to petition this court and other law enforcement agencies to address the unlawful and discriminatory practices of Fox News.

485.    In its abuse of process, Fox News used the state courts in a perverted manner to obtain advantage against Ms. Grossberg in other courts and with the law enforcement agencies

that Ms. Grossberg planned to complain about Fox News's unlawful, discriminatory, and harassing treatment of women employees.

486.    The Entity Defendants also used the threat and filing of a complaint and application for injunctive relief in the Supreme Court of New York with the intent to intimidate and stop Ms. Grossberg from exercising her rights to publicly address the practices of Fox News and the Fox News Attorneys in what she believed was an unlawful attempt to intimidate and pressure her into not testifying to the whole truth as she knew it in the Dominion/Fox lawsuit or else face negative consequences at Fox News – including implying that her employment would be terminated if she did not cooperate with their plans and strategy for the Dominion/Fox lawsuit.

487.    In its abuse of process, Fox News used the state courts in a perverted manner to silence Ms. Grossberg from exercising her rights to publicly address Fox News's wrongful conduct in intimidating her into not testifying to the whole truth in the Dominion/Fox Lawsuit.

488.    Fox News subsequently directly threatened Ms. Grossberg with termination if she went public with her concerns regarding the conduct of Fox News and the Fox News Attorneys in the Dominion/Fox Lawsuit.  Fox News in fact placed Ms. Grossberg on administrative leave on Monday, March 20, 2023, within hours of her advising Fox News that she intended to file her complaints of discrimination and improper conduct in the Dominion/Fox Lawsuit.

489.    Fox News then terminated Ms. Grossberg's employment four days later, on Friday, March 24, 2023, after this Court rejected Fox News's attempt to block the public from having access to Ms. Grossberg's allegations regarding of the copious misconduct by Fox News as detailed *supra*.

490.    On March 24, 2023, Fox News carried through with its threats and unlawfully terminated Ms. Grossberg's employment.

491.    Given the ongoing discrimination, and retaliation she faced at Fox News throughout her four-year career, it is clear that Fox News unlawfully terminated Ms. Grossberg – in part – because of the sex-based animus that Fox News harbors against her.

492.    Based on the temporal proximity between Ms. Grossberg asserting her rights as a woman not to be subjected to chauvinistic, sexist, misogynistic, toxic, and a pervasively hostile work environment, as well as her right (and obligation) as a citizen to tell the truth under oath, it is clear that Fox News unlawfully terminated Ms. Grossberg – in part – because she intended to to correct her deposition testimony to be truthful and complete and, perhaps, testify for Dominion in open court.

493.    Based on the actions, conduct, and events described *supra*, Fox News issued civil process with an intent to do harm to Ms. Grossberg without excuse or justification, and Fox News did so in a perverted manner to obtain its collateral objectives of silencing Ms. Grossberg, hiding its grotesque treatment of female employees, and gaining improper advantages in the Dominion/Fox Lawsuit.

494.    Based on the actions, conduct, and events described *supra*, Fox News knowingly or recklessly engaged in abuse of process.

495.    As a direct and proximate result of the Entity Defendants' unlawful and wrongful actions or omissions against Plaintiff, as described herein, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice; and (f) the costs associated with defending herself against Defendants' actions, entitling her to all available damages, including, but not limited to, punitive damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor against Defendants as follows:

A.   Declaring that Defendants have engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by federal, New York State and New York City law;

B.   Awarding Plaintiff compensatory damages for all back and future loss of wages, lost income, benefits, retirement losses, stock benefits losses, pain, suffering, stress, humiliation, mental anguish, emotional harm and personal physical injury and physical sickness, as well as damage to her reputation, damage to career path, and loss of income stemming therefrom;

C.   Awarding Plaintiff liquidated damages;

D.   Awarding Plaintiff treble damages;

E.   Awarding Plaintiff punitive damages;

F.   Awarding Plaintiff attorneys' fees, litigation costs, and expert/consultant fees;

G.   Awarding Plaintiff pre- and post-judgment interest;

H.   Awarding Plaintiff reimbursement for the negative tax consequences of a judgment; and

I.   Awarding Plaintiff such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues properly triable by jury.

Dated:   March 26, 2023
         White Plains, New York

**FILIPPATOS PLLC**

By: _____

Parisis G. Filippatos

Tanvir H. Rahman

199 Main Street, Suite 800

White Plains, NY 10601

(914) 984-1111

pgf@filippatoslaw.com

trahman@filippatoslaw.com

*Attorneys for Plaintiff Abby Grossberg*